411 So.2d 930 (1982)
FLORIDA DEPARTMENT OF CORRECTIONS, Appellant,
v.
BLOUNT PONTIAC-GMC, INC., Appellee.
No. AF-249.
District Court of Appeal of Florida, First District.
March 18, 1982.
*931 Jim Smith, Atty. Gen. and Gerald B. Curington, Asst. Atty. Gen., Tallahassee, for appellant.
C. Valentine Bates of Bates & Costello, Gainesville, for appellee.
PER CURIAM.
The Florida Department of Corrections (DOC) appeals from a final summary judgment granting a writ of replevin for a fire truck in favor of appellee Blount Pontiac-GMC, Inc. (Blount). We reverse.
On May 4, 1978, DOC sent out invitations to bid for a fire truck meeting certain state specifications. Ward LaFrance Truck Corporation of Elmira, New York, through its Florida agent/distributor Eagle Fire Trucks, Inc., made the low bid and was awarded the contract on May 31, 1978. Upon receiving the contract, Eagle bought a 1978 GM Series 3500 chassis and cab from Blount Pontiac-GMC, Inc.
Eagle did not immediately pay Blount for the chassis and cab. Rather, pursuant to its usual commercial practices in such transactions, Blount retained the manufacturer's statement of origin (MSO) pending payment. The MSO is essentially a document issued by the manufacturer to whomever purchases the vehicle directly from the manufacturer. By retaining the MSO Blount was able to postpone for Eagle and other similarly situated customers payments to General Motors Acceptance Corporation (GMAC) for a period of up to 120 days while the vehicle was being modified. This practice insures savings for both the immediate customer and the ultimate consumer.
Eagle then sent the chassis and cab to Ward LaFrance, which modified the chassis and cab according to the bid specifications. Ward LaFrance then delivered the fire truck, as modified, to DOC on January 10, 1979. Without making any investigation into the state of the fire truck's title, DOC made full payment to Ward LaFrance on *932 January 17, 1979. According to usual practice, Ward LaFrance at this point would have paid Blount for the chassis and cab and Blount would then have transferred the MSO to Eagle for delivery to DOC. However, after Ward LaFrance was paid by DOC but before it settled its account with Blount, it went bankrupt. Since it had not received payment for the fire truck, Blount instituted this action for replevin against DOC.
Blount argues that his case is governed by the provisions of Section 319.21(1), Florida Statutes:
No manufacturer, distributor, dealer or other person shall sell or otherwise dispose of a new motor vehicle to a distributor, dealer or other person without delivering to such distributor, dealer or other person a manufacturer's statement of origin duly executed and with such assignments thereon as may be necessary to show title in the purchaser thereof, on forms approved by The Department of Highway Safety and Motor Vehicles; nor shall any distributor, dealer or other person purchase, acquire or bring into the state, except for temporary use and not for sale, a new motor vehicle without obtaining from the seller thereof such manufacturer's statement of origin ... (emphasis supplied)
Blount urges that DOC's failure to strictly comply with the underscored passage prevents it from taking title to the truck. On the other hand, DOC argues that it received valid title to the fire truck as a good faith purchaser for value under the Uniform Commercial Code (§ 672.403, Fla. Stat.). We find DOC's argument to be correct.
It is clear that the provisions of Chapter 319 take precedence over any provision of the UCC which may be inconsistent or in conflict with Chapter 319. § 680.104(2)(h), Fla. Stat. However, it has been consistently held that Section 672.403 is not in direct conflict with the provisions of Chapter 319, in particular Sections 319.21 and 319.22. Harmony Homes, Inc. v. Zeit, 260 So.2d 218 (Fla. 1st DCA 1972); Stroman v. Orlando Bank & Trust Co., 239 So.2d 621 (Fla. 4th DCA 1970); Correria v. Orlando Bank & Trust Co., 235 So.2d 20 (Fla. 4th DCA 1970). These cases also hold that, if the owner of a motor vehicle entrusts it with a dealer who deals in the sale of motor vehicles, that dealer has the power to pass on valid title, although not marketable title, to a buyer in the ordinary course of business even though a title certificate is retained by the original owner and never delivered to the buyer. Murray, Commercial Law, 30 U.Miami L.Rev. 63, 100-101 (1975). In other words, Section 319.22(1) provides that a purchaser shall not acquire a "marketable" title until the certificate of title is issued to him; however, it does not prevent valid title from being passed. Correria, at 24.
Under Section 671.201(9), a "buyer in ordinary course of business" is "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker." Here, while DOC could have done more to ascertain the nature of Eagle's property interest in the fire truck, the purchase was still made in good faith and without knowledge that ownership rights were in Blount. DOC knew nothing of the commercial arrangement between Eagle and Blount regarding the disposition of the fire truck. Compare O'Neill v. Barnett Bank of Jacksonville, 360 So.2d 150 (Fla. 1st DCA 1978).
Blount, however, contends that DOC cannot be a buyer in the ordinary course of business because the sale was not made out of Eagle's "inventory". The Uniform Commercial Code provides the following definition of inventory:
(Goods that) are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment.
*933 § 679.109(4), Fla. Stat. Blount would have us construe this passage as referring to goods that are present at the merchant's place of business rather than goods which are usually carried but are not in stock at the time of the sale. Under this line of reasoning, since the fire truck was a special order, it could not have come out of Eagle's "inventory." We decline to accept such a circumscribed view of the term. Comment 3 to UCC 9-109 [§ 679.109] states:
The principle test to determine whether goods are inventory is that they are held for immediate or ultimate sale. Implicit in the definition is the criterion that the prospective sale is in the ordinary course of business.
This fire truck certainly falls within that definition. Further, Blount's view is contrary to the manifest statutory intent of the UCC, the provisions of which are to be "liberally construed and applied to promote its underlying purposes and policies." § 671.102(1) Fla. Stat. By Blount's argument, for example, any time an auto buyer ordered a car with special options from a franchised dealer, that car, when delivered by the manufacturer, would not be deemed a part of the franchised dealer's inventory because it was not on the lot but was special-ordered. Grafting such an interpretation upon Section 679.109(4) would gut the purpose of Section 672.403, which purpose is to protect buyers in due course:
In Section 2-403 of the Code [§ 672.403, Fla. Stat.], the bold decision is made to apply in a limited form at least the commercial or mercantile theory to goods. Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him the power to transfer all rights of the entruster to a buyer in the ordinary course of business. The buyer in the ordinary course is one who in good faith buys goods from a person in the business of selling goods of that kind... The effect of these provisions is that when goods are sold in an unquestionably commercial setting, they are to be given a high degree of negotiability. (Emphasis supplied).
Warren, Cutting Off Claims of Ownership under the Uniform Commercial Code, U.Chi.L.Rev. 469, 472 (1962), cited favorably in Correria, at 23. Blount must be held to this standard. Indeed, it created the situation by entrusting its cab and chassis to Ward LaFrance and Eagle. Having done so, it must bear the onus of Ward LaFrance's bankruptcy. To hold otherwise would only frustrate the easy flow of commercial transactions, a result which is antithetical to the purposes of the Code.
Accordingly, the final summary judgment is REVERSED and the cause is REMANDED with directions to enter a judgment in favor of DOC and against Blount Pontiac-GMC, Inc.
McCORD, ERVIN and SHAW, JJ., concur.