228 N.J. Super. 77 (1988)
548 A.2d 1161
BARCO AUTO LEASING CORP., PLAINTIFF-RESPONDENT,
v.
LEO HOLT AND HOLT INTERNATIONAL MOTORS, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted September 13, 1988.
Decided October 6, 1988.
*79 Before Judges MICHELS and KEEFE.
John A. Evans, attorney for appellants.
Andres Wirkmaa, attorney for respondent.
The opinion of the court was delivered by MICHELS, P.J.A.D.
Defendants Leo Holt and Holt International Motors (Holt International) appeal from a summary judgment of the Law Division that awarded plaintiff Barco Auto Leasing Corporation damages in the sum of $19,300 for the conversion of a BMW car.
The record, on the basis of which the summary judgment under review was entered in this matter, reveals that on or about October 29, 1983, Exotic Car Leasing Corporation (Exotic) of Pompano Beach, Florida, sold a 1981 733i BMW, Vehicle Identification No. "WBAFF3307B7351243" to plaintiff, a New York corporation authorized to do business in New Jersey. The document evidencing this transaction is a form issued by the State of Florida entitled "Division of Motor Vehicles Reassignment by Licensed Dealer", which, according to the affidavit of plaintiff's Vice President and General Counsel Richard Leibowitz (Leibowitz), demonstrates that the BMW was titled in Florida. Pursuant to a vehicle lease agreement executed on January 1, 1984, plaintiff subsequently leased the BMW back to Exotic. Paragraph 18 of this contract provided, in pertinent part, that "[t]his is an agreement of lease only. We retain title *80 to the vehicle." This lease contract was personally guaranteed by Exotic's president, John McKinnon (McKinnon).
According to the affidavit of Leibowitz, Exotic subsequently fell into arrears on the monthly lease payments in or around May 1984, the last payment having been received by plaintiff in December 1984. When plaintiff attempted to repossess the BMW, however, Liebowitz learned that McKinnon and his company had "disappeared" and were being sought by the police on charges of fraud and passing bad checks. Leibowitz then discovered that McKinnon had sold the BMW to Holt International, a New Jersey corporation, and that the BMW had been involved in an accident while being driven by the son of Leo Holt, the principal of Holt International.
By letter dated October 1, 1985, Leibowitz advised Leo Holt that plaintiff owned the BMW which had purportedly been delivered to defendant's place of business in Pennsauken, New Jersey. Shortly thereafter, Leo Holt called Leibowitz and advised him that he had obtained the BMW from McKinnon in November 1984 as payment for a debt owed by McKinnon. However, Leo Holt further informed Leibowitz that the BMW had been sold approximately 8 months earlier to a party whom Leo Holt declined to identify. Plaintiff did not learn the identity of the buyer until he received a letter from defendants' counsel in May 1987. According to the invoice enclosed therein, the BMW had been sold by Holt International to Global Motors, Inc. of Knoxville, Tennessee on September 27, 1985.
Plaintiff initiated this action against defendants for the alleged wrongful conversion of the 1981 BMW on January 22, 1986. Plaintiff alleged that it was and still is the record owner of the vehicle and charged that "defendant had full knowledge of the fact that the subject automobile was not owned by Mr. McKinnon or his company but was rather [sic] leased to them by the plaintiff and that title was in the name of the plaintiff corporation." (Emphasis added). Defendants denied these allegations in their answer and later contended, in opposing *81 plaintiff's summary judgment motion, that plaintiff had never filed a certificate of title in either Florida, New Jersey or New York. According to the affidavit of Leo Holt, McKinnon, from whom he had purchased several automobiles in the past with no problems, advised him on November 1, 1984, that Exotic owned the subject BMW. Leo Holt then purchased the automobile on behalf of Holt Sport Car Classics, Inc. (Holt SCC) for the sum of $18,000. This transaction is evidenced by an Exotic invoice dated November 1, 1984. Although McKinnon did not have physical possession of the certificate of title to the BMW at that time, he advised Leo Holt that the document was at his bank and promised that it would be delivered promptly.
After McKinnon failed to deliver title as promised, Leo Holt threatened to return the vehicle. According to Leo Holt, however, McKinnon advised him at this point that he had "lost" the title certificate after removing it from the bank, but that he would contact Emanuel Andrews (Andrews), the person who had sold the BMW to Exotic, and ask him to obtain a duplicate certificate. Subsequently a meeting occurred between Leo Holt, McKinnon and Andrews, at which time Andrews endorsed a duplicate copy of title directly over to Holt SCC pursuant to McKinnon's instructions.
Timothy Holt, Leo Holt's son and president of Holt SCC, which is in the business of buying and selling used automobiles, applied for and received a certificate of ownership for the BMW on behalf of Holt SCC. The BMW was eventually titled in New Jersey in or around May 1985. The document evidencing this is the certificate of title issued by the Commonwealth of Pennsylvania to Andrews indicating "NJ title issued" to Holt SCC as first assignee. According to the affidavit of Beth Everett Frederick (Frederick), a legal assistant with defendant's counsel, the Pennsylvania Department of Transportation advised her on March 27, 1987, that Andrews had in fact been issued a duplicate Certificate of Title on March 12, 1985. Frederick further attested that she subsequently contacted the Department of Motor Vehicles in New York, Florida and New Jersey, *82 all of whom informed her that plaintiff had never registered or titled a 1981 733i BMW bearing Vehicle Identification Number "WBAFF3307B7351243" in those states.
The trial court granted summary judgment in favor of plaintiff and awarded it damages in the amount of $19,300, the book value of the BMW at the time of the alleged conversion. Although the trial court did not address the issue of plaintiff's failure to register title to the BMW in Florida, it reasoned, in pertinent part, that "[d]efendants' contentions that the automobile was acquired in good faith is not germane to the issue of liability in tort since `The elements of good faith, intent or negligence do not play a part in an action for damages in conversion.'" Defendant appealed, contending that the trial court erred in granting summary judgment in favor of plaintiff.
Traditionally, in tort actions where both New Jersey as the forum state and a sister state shared jurisdiction, the choice of law question was resolved by the doctrine of lex loci delicti, "rigidly applying the [substantive] law of the place where the wrong occurred." Deemer v. Silk City Textile Mach. Co., 193 N.J. Super. 643, 648 (App.Div. 1984), quoting Van Dyke v. Bolves, 107 N.J. Super. 338, 342-343 (App.Div. 1969) (parenthetical added in Deemer.) This doctrine, however, has been abandoned in favor of the more flexible "governmental interest" approach, which our Supreme Court succinctly explained in Veazey v. Doremus, 103 N.J. 244, 248 (1986):
Under that analysis, the determinative law is that of the state with the greatest interest in governing the particular issue. See, e.g., White v. Smith, 398 F. Supp. 130, 134 (D.N.J. 1975); McSwain v. McSwain, 420 Pa. 86, 94, 215 A.2d 677, 682 (1966). The first step in the analysis is to determine whether a conflict exists between the law of the interested states. Any such conflict is to be determined on an issue-by-issue basis. See, e.g., White v. Smith, supra, 398 F. Supp. at 134; R. Leflar, American Conflicts Law § 92, at 185 (3rd ed. 1977); R. Weintraub, Commentary on the Conflict of Laws § 6.9, at 285 (2d ed. 1980). If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties. See, e.g., Henry v. Richardson-Merrell, Inc., 508 F.2d 28, 32 (3rd Cir.1975); White v. Smith, supra, 398 F. Supp. at 134-35; Schwartz v. Schwartz, 103 Ariz. 562, 564, 447 *83 P.2d 254, 256 (1968); Pfau v. Trent Aluminum Co., supra, 55 N.J. [511] at 516-23. If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. See Pfau v. Trent Aluminum Co., supra, 55 N.J. at 521-22; Mellk v. Sarahson, supra, 49 N.J. [226] at 230. Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply. See Henry v. Richardson-Merrell, Inc., supra, 508 F.2d at 32; White v. Smith, supra, 398 F. Supp. at 134.
See also Deemer, 193 N.J. Super. at 648-649; Seckular v. Celotex, 209 N.J. Super. 242, 248-249 (App.Div. 1986).
Here, the trial court concluded that this case was controlled by the New Jersey tort law principles of conversion as discussed in McGlynn v. Schultz, 90 N.J. Super. 505 (Ch.Div. 1966), aff'd 95 N.J. Super. 412 (App.Div. 1967), certif. den. 50 N.J. 409 (1967) and Winkler v. Hartford Accident and Indemnity Co., 66 N.J. Super. 22 (App.Div. 1961), certif. den. 34 N.J. 581 (1961). These cases, while not factually relevant, enunciate the basic principles of law concerning the tort of conversion, which is defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." McGlynn, 90 N.J. Super. at 526, quoting 89 C.J.S. Trover and Conversion § 1, p. 531; Winkler, 66 N.J. Super. at 27. Generally, the trial court observed, "[t]he elements of good faith, intent or negligence do not play a part in an action for damages in conversion." McGlynn, 90 N.J. Super. at 526.
Under the circumstances here, however, these common law principles are not controlling. Inasmuch as a sale of goods  namely, the BMW  is the alleged act of conversion, this case is governed by Article 2 of the Uniform Commercial Code (U.C.C.), which has been adopted in both New Jersey and Florida. Specifically, the applicable UCC section is Section 2-403, which is codified in New Jersey as N.J.S.A. 12A:2-403 and in Florida as F.S.A. 672.403, and provides, in pertinent part, as follows:
Power to Transfer; Good Faith Purchase of Goods; "Entrusting".

*84 (1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though
(a) the transferor was deceived as to the identity of the purchaser, or
(b) the delivery was in exchange for a check which is later dishonored, or
(c) it was agreed that the transaction was to be a "cash sale", or
(d) the delivery was procured through fraud punishable as larcenous under the criminal law.
(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.
(3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.
Applying these principles here, it is clear an act of "entrustment" occurred. Primarily, Exotic was in the business of buying, selling and leasing automobiles and was therefore "a merchant who deals in goods of that kind" as provided in Section 2-403(2). Secondly, after the BMW was sold by Exotic to plaintiff, plaintiff delivered it back to Exotic and acquiesced in Exotic's retention of possession as required in Section 2-403(3) by executing the lease agreement. As such, it is clear that under the U.C.C., Exotic, the entrustee, had power to convey good title to Holt International, provided that Holt International was "a buyer in ordinary course of business" under Subsection (2). According to N.J.S.A. 12A:1-201(9) and F.S.A. 671.201(9) a "buyer in ordinary course of business" is defined as:
a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. (Emphasis added).
Thus, contrary to the conclusion reached by the trial court, the element of good faith was crucial to the disposition of this case.
*85 Although both New Jersey and Florida agree that the purpose of Section 2-403 is to protect the purchasers in the ordinary course of business and to promote the negotiability of goods sold in commercial settings, Martin v. Nager, 192 N.J. Super. 189, 203-204 (Ch.Div. 1983), Shannon v. Snedeker, 192 N.J. Super. 366, 372 (Ch.Div. 1983), Carlsen v. Rivera, 382 So.2d 825, 826 (Fla. Dist. Ct. App. 1980); Fla. Dept. of Corrections v. Blount, etc., 411 So.2d 930, 933 (Fla. Dist. Ct. App. 1982); Correria v. The Orlando Bank & Trust Co., 235 So.2d 20, 22-23 (Fla. Dist. Ct. App. 1970), it is the law of Florida, not New Jersey which should technically control. Applying the "governmental interest" approach, the contacts which occurred in Florida are far more relevant to these policy considerations than those which took place in New Jersey: the contract of sale and lease arrangement between plaintiff and Exotic were negotiated and executed in Florida, and the BMW remained in Florida where it was sold to defendants before being transported to New Jersey. Although Holt International thereafter titled the car with the New Jersey Department of Motor Vehicles, the issue of defendants' good faith turns upon whether they had actual or constructive knowledge of plaintiff's ownership interest in the BMW at the time the sale with Exotic was consummated in Florida. This implicates not only Section 2-403 of the U.C.C. but also the applicable Florida statute governing the issuance of motor vehicle title certificates, F.S.A. § 319.22(1), which provides as follows:
(1) Except as provided in ss. 319.21 and 319.28, a person acquiring a motor vehicle or mobile home from the owner thereof, whether or not the owner is a licensed dealer, shall not acquire marketable title to the motor vehicle or mobile home until he has had issued to him a certificate of title to the motor vehicle or mobile home; nor shall any waiver or estoppel operate in favor of such person against a person having possession of such certificate of title or an assignment of such certificate for such motor vehicle or mobile home for a valuable consideration. Except as otherwise provided herein, no court shall recognize the right, title, claim, or interest of any person in or to any motor vehicle or mobile home sold, disposed of, mortgaged, or encumbered, unless evidenced by a certificate of title duly issued to that person, in accordance with the provisions of this chapter. (Emphasis added)
*86 In view of this statute, there are at least two genuine issues of material fact which would preclude summary judgment. Primarily, plaintiff has failed to demonstrate that it did in fact obtain a certificate of title from Exotic in order for this court to even recognize that it has a "right, title, claim or interest" in the BMW. Contrary to plaintiff's assertions, the existence of such a document should not simply be inferred from the fact that Exotic issued a "Reassignment by Licensed Dealer" form. If plaintiff intended to remove all genuine issues of material fact as to its ownership, it should have included a copy of the title certificate in its moving papers. Secondly, it is submitted that even if plaintiff did obtain a Florida certificate of title, there is nothing in the record to indicate that defendant had knowledge of this fact so as to preclude the application of F.S.A. § 672.403. To the contrary, the Florida decisional law indicates that defendants should receive protection under the entrustment provisions of that statute as a "buyer in ordinary course of business" even if they did not receive a valid Florida certificate of title. See generally Blount, supra, 411 So.2d at 932, (holding that "if the owner of a motor vehicle entrusts it with a dealer who deals in the sale of motor vehicles, that dealer has the power to pass on valid title, although not marketable title, to a buyer in the ordinary course of business even though a title certificate is retained by the original owner and never delivered to the buyer.")
Moreover, Carlsen v. Rivera, supra, upon which defendants rely, supports their position. There, the plaintiff owner of a Canadian car leasing agency leased a 1976 Mercedes Benz to one McEnroe, whom he knew to be the owner of a dealership. McEnroe then fraudulently obtained title to the automobile and sold it to a Florida rental agency, which in turn procured a facially valid Florida title certificate. The car was subsequently sold to two more Florida car dealers under this certificate before being purchased by defendant, against whom plaintiff brought an action in replevin. The trial court found in favor of plaintiff on the grounds that McEnroe never had lawful ownership *87 or title to the car; therefore every subsequent attempt to convey title was deemed void. The Florida Court of Appeals rejected this conclusion, reasoning that since McEnroe had obtained possession lawfully, he could convey a voidable title, which would become perfected upon a sale to a buyer in the ordinary course of business under F.S.A. § 672.403. In so doing, the Florida court found "it very clear that any delivery of possession and any acquiescence in retention of possession constitutes entrustment under the statute. This would obviously include a lease agreement." Rivera, supra, 382 So.2d at 826. The Florida Court of Appeals, reversed and remanded the case, concluding that since the defendant "had no notice of any defect in the title and in fact obtained a title certificate," he was "clearly a buyer in the ordinary course of business." Id. at 827.
The parallels between Rivera and this matter are clear; since Exotic obtained lawful possession of the BMW pursuant to the lease agreement with plaintiff, and plaintiff failed to demonstrate that defendants knew of any defect in the title which they received from Andrews, the matter should not have been resolved by summary judgment. Concededly, there is a discrepancy between the document purporting to re-assign title of the BMW from Exotic to plaintiff on October 29, 1983, and the fact that Andrews, a Pennsylvania resident, was able to obtain a duplicate Pennsylvania Certificate of Title to the vehicle on March 12, 1985. Moreover, if as Leo Holt states in his affidavit, McKinnon advised him that Exotic originally purchased the car from Andrews, it is unclear why this transaction was not indicated on the duplicate Pennsylvania certificate, why Andrews would agree to come all the way to Florida in order to assign it over to plaintiff, or why an experienced car dealer like McKinnon would inadvertently "lose" the Exotic title certificate after taking it out of the bank.
Stated differently, it simply cannot be inferred from the record before us that defendants were aware of plaintiff's ownership interest in the BMW merely because of the existence *88 of the "Reassignment of Licensed Dealers" form or the lease agreement. Nor does defendants' failure to obtain a title certificate from Exotic immediately at the time of the sale compel the conclusion that Holt International was not a bona fide purchaser. In construing F.S.A. § 319.22(1) together with F.S.A. § 672.403, the courts are generally in agreement that "the failure of the purchaser to obtain a certificate of title at the time of sale does not prevent the passage of title from the dealer to the buyer where the buyer has received possession for value without notice and in good faith relies on the dealer to perform his statutory duty to secure a proper title certificate in the purchaser's name." Harmony Homes, Inc. v. Zeit, 260 So.2d 218, 220 (Fla. Dist. Ct. App. 1972); Correria, supra, 235 So.2d at 24; Blount, supra, 411 So.2d at 932. Stated simply, we are satisfied that plaintiff failed to exclude all reasonable doubt as to the existence of genuine material factual issues, thus precluding the grant of summary judgment and mandating a plenary hearing.
Accordingly, the summary judgment in favor of plaintiff is reversed and the matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.