962 A.2d 1139 (2009)
404 N.J. Super. 585
Michael R. LaPLACE, Plaintiff-Appellant,
v.
Pierre BRIERE, individually and trading as Pierre Briere Quarter Horses, and Pierre Briere Quarter Horses, LLC, Charlene Bridgwood, Douglas Gultz and Sherry Gultz, husband and wife, Defendants-Respondents, and
Pierre Briere, individually and trading as Pierre Briere Quarter Horses, and Pierre Briere Quarter Horses, LLC, Defendants/Third-Party Plaintiffs-Respondents,
v.
Charlene Bridgwood, Third-Party Defendant-Respondent.
DOCKET NO. A-1625-07T3.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 2008.
Decided January 12, 2009.
*1142 Frank D. Rivellini, Hackensack, argued the cause for appellant (Francis J. DeVito, P.A., attorneys; Michael Natiello, on the brief).
Marc B. Schuley, argued the cause for respondents Pierre Briere, Pierre Briere Quarter Horses, Pierre Briere Quarter Horses, LLC, Douglas Gultz and Sherry Gultz (Barrett Lazar, L.L.C., attorneys; Virginia M. Barrett, Maywood, of counsel and on the brief).
Jon Robinson, argued the cause for respondent Charlene Bridgwood (Law Offices of Craig M. Terkowitz, attorneys, Piscataway; Mr. Robinson, on the brief).
Before Judges WINKELSTEIN, FUENTES and CHAMBERS.
The opinion of the court was delivered by
CHAMBERS, J.A.D.
The unusual facts of this case require us to visit the common law principles governing bailment and conversion, not often encountered today.
Plaintiff Michael R. LaPlace brought this suit to recover for the loss of his horse which died while boarding at a stable owned by defendants Pierre Briere, trading as Pierre Briere Quarter Horses, and Pierre Briere Quarter Horses, LLC ("Briere stable") and while being exercised by defendant Charlene Bridgwood. The trial court granted summary judgment for the defendants and denied plaintiff's motion for partial summary judgment on the issue of liability. Plaintiff now appeals.[1]
The first question presented by this appeal is whether a person who exercises a horse without permission to do so is liable under the tort of conversion when the horse dies during the exercise and there is no evidence of the cause of the horse's death nor is there evidence that the exercising was done negligently. The second question is whether the stable where the horse was boarded and where the death occurred may be liable under the law of bailment under these circumstances. We answer both of these questions in the negative, and we affirm the granting of summary judgment to defendants and the denial of partial summary judgment to plaintiff.

I
In reviewing an appeal from a decision on motions for summary judgment, we employ the same standard applied by the trial court. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d *1143 597 (App.Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). Summary judgment will be granted where no genuine issue of material fact is present and the movant is entitled to judgment as a matter of law. R. 4:46-2(c). When determining whether a genuine issue of material fact is present, we must look at the competent evidence "in the light most favorable to the non-moving party" and determine whether that evidence is "sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). If the evidence is sufficient to meet that standard, the motion will be denied. Ibid.
Plaintiff was the owner of a horse named Park Me In First. In 2000, plaintiff entered into a verbal agreement with Briere stable for the care, maintenance, and training of his horses, which, beginning in 2002, also included Park Me in First. He paid Briere stable a monthly fee. Briere stable was responsible for providing shelter, food, water, training, and grooming to the horses when they were there. With the consent of a horse's owner, Briere stable would also arrange for shoeing and medical care for horses at the stable. Since Park Me In First was a trained quarter horse who participated in horse shows and competitions around the country, plaintiff and his daughter would from time to time remove the horse from Briere stable in order to take it to these events.
On February 12, 2006, plaintiff and defendant Pierre Briere were at a horse show in North Carolina, when they learned that Park Me In First had died while being exercised by Bridgwood at Briere stable. According to Bridgwood, whose horse was also kept at Briere stable, she had gone to the stable that day to help out. She thought that the stable might be shorthanded because Pierre Briere was away and the staff might not be able to get to work due to snow that had fallen the night before. She asked Douglas Gultz, whom she described as a person who oversaw the stable when Pierre Briere was away, if there was anything she could do to help. She testified that he replied that she could "lunge" the horses, although he denies saying so.
Lunging is a way of exercising a horse by having it walk, trot, or canter in a circle while it is secured to a lunge line handled by a person standing in the center of the circle. Lunging is generally part of a horse's daily routine and is not considered dangerous. Bridgwood had owned horses for thirty-five to forty-five years and had trained, lunged, and cared for horses at her former husband's facility for twenty years. Ten to fifteen years earlier, she had lunged plaintiff's horses dozens of times over a period of three or four years when they were located at her former husband's farm, and she had lunged at least one of plaintiff's horses at a horse show. Pierre Briere, who had seen Bridgwood lunge horses fifty to one hundred times before February 12, 2006, testified at his deposition that he found her to be "very capable" of handling and lunging a horse.
Bridgwood explained that on February 12, 2006, she first lunged her horse for about fifteen minutes without incident and then proceeded to lunge Park Me In First. She selected him for exercising because she knew he was a well trained, well mannered horse, and she thought that plaintiff, who was a friend of hers, would appreciate her doing so. She testified that the horse was well behaved for the first five minutes. He then suddenly reared up on his hind legs and collapsed on his side with blood pumping from his nose and died.
The veterinarian was unable to determine the cause of death without performing *1144 a necropsy upon the horse. According to Pierre Briere, on the day of the horse's death, plaintiff declined to authorize further examination to determine the cause of death, saying that he did not want to spend any more money on the horse. Plaintiff, however, does not recall having any conversation about a necropsy on the day the horse died. While Bridgwood offered to pay for a necropsy, the veterinarian would not do so without the consent of the owner, and Bridgwood did not ask plaintiff for such permission. Pierre Briere also asked the veterinarian to conduct an examination to determine the cause of death at his expense, but she would not do so without the owner's authorization. Plaintiff testified that when he requested a necropsy a couple of days later, he was told it was too late because the horse's remains had been removed. As a result, the record has no expert proofs on the cause of death.[2] It is unknown whether the horse had any underlying medical condition that caused its death, unrelated to Bridgwood's conduct in exercising the horse. There are no proofs that the lunging caused the horse's death.
Plaintiff maintains that the only people authorized to handle his horses at Briere's stable were Briere's employees and that he never gave Bridgwood permission to handle his horses outside of his presence. He acknowledged that he had once allowed her to ride Park Me In First for a few moments in his presence, which she did without incident.
Plaintiff filed this lawsuit against Briere stable, asserting breach of the bailment agreement, breach of contract, conversion, and negligence. He also asserted claims in conversion and negligence against Bridgwood. On October 10, 2007, the trial court granted defendants' cross-motion for summary judgment and denied plaintiff's motions for partial summary judgment on liability. Plaintiff's motion for reconsideration was denied on November 16, 2007.
On appeal, plaintiff contends that the trial court erred in denying his request for partial summary judgment. He argues that Bridgwood is liable for conversion of the horse. He maintains that Briere stable, as the bailee for the horse, is liable in conversion and in negligence for the loss of the horse. He further asserts that due to the bailment relationship, Briere stable bore the burden of coming forward with evidence that the horse did not die as a result of its negligence, and that it failed to do so.

II
We will first address plaintiff's claim that the trial court erred in denying his request for partial summary judgment as to Bridgwood. According to plaintiff, Bridgwood committed a conversion when she lunged the horse without authorization to do so, and that as a result, she is liable for the loss of the horse. For purposes of this analysis, we will assume that Bridgwood was not authorized to exercise the horse since we must give plaintiff all of the favorable inferences that may be drawn from the evidence. See R. 4:46-2(c).
Conversion has been defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Barco Auto Leasing Corp. v. Holt, 228 N.J.Super. 77, 83, 548 A.2d 1161 (App.Div.1988) *1145 (quoting McGlynn v. Schultz, 90 N.J.Super. 505, 526, 218 A.2d 408 (Ch.Div.1966), certif. denied, 50 N.J. 409, 235 A.2d 901 (1967)). Conversion is an intentional tort in that the defendant must have intended "to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." Prosser and Keeton on Torts § 15 at 92 (5th ed. 1984). However, the defendant need not knowingly or intentionally act wrongfully for a conversion to occur. Ibid. Conversion is "the wrongful exercise of dominion and control over property owned by another inconsistent with the owners' rights." Sun Coast Merch. Corp. v. Myron Corp., 393 N.J.Super. 55, 84, 922 A.2d 782 (App.Div.2007) (quoting Port-O-San Corp. v. Teamsters Local Union No. 863 Welfare & Pension Funds, 363 N.J.Super. 431, 440, 833 A.2d 633 (App.Div.2003)), certif. denied, 194 N.J. 270, 944 A.2d 30 (2008).
As a result, the mere use of the property of another without permission of the owner does not necessarily amount to conversion. See Prosser and Keeton on Torts § 15 at 94 (5th ed. 1984) (stating "[i]t is not, however, every unauthorized taking of goods from the possession of another which is sufficiently serious to amount to conversion"); Frome v. Dennis, 45 N.J.L. 515 (Sup.Ct. 1883) (borrowing a plow without the owner's permission, using it to plow a field and then returning it four days later did not constitute conversion); Restatement (Second) of Torts § 227 comment b (1965). Where the "casual and harmless use" of the chattel of another involves "no defiance of the owner's right of dominion" over the chattel, then no conversion has occurred. Prosser and Keeton on Torts § 15 at 101 (5th ed. 1984).
The law has long recognized that "[t]o constitute a conversion of goods, there must be some repudiation by the defendant of the owner's right, or some exercise of dominion over them by him inconsistent with such right, or some act done which has the effect of destroying or changing the quality of the chattel." Frome v. Dennis, supra, 45 N.J.L. at 516 (quoting Woodside v. Adams, 40 N.J.L. 417, 431 (Sup.Ct.1878)).
The theory behind conversion is that the actor has exerted such a major and serious interference with the plaintiff's rights to the chattel that in essence the law will force a judicial sale of the chattel upon the defendant. Prosser and Keeton on Torts § 15 at 90 (5th ed. 1984). The Restatement (Second) of Torts describes the tort in this way: "[c]onversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) of Torts § 222A(1) (1965). In weighing the seriousness of the interference with the owner's rights to the chattel to determine if a conversion has occurred, we should consider the following factors:
(a) [T]he extent and duration of the actor's exercise of dominion or control;
(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;
(c) the actor's good faith;
(d) the extent and duration of the resulting interference with the other's right of control;
(e) the harm done to the chattel;
(f) the inconvenience and expense caused to the other.
[Restatement (Second) of Torts § 222A(2) (1965).]
In light of these legal principles, Bridgwood's conduct in exercising the horse under the circumstances here, even if she was unauthorized to do so, did not constitute a conversion. While her act was *1146 intentional, in that she intended to lunge the horse, Bridgwood did not exercise such control and dominion over the horse when lunging it that she seriously interfered with plaintiff's ownership rights in the horse. She did not remove the horse from the Briere stable where plaintiff had left the horse for safekeeping. At the time, she was not interfering with plaintiff's use or possession of the horse. Lunging is part of the daily care of the horse and is not conduct that would intrinsically be viewed as cloaking the actor with the rights of an owner. Bridgwood exercised the horse in good faith, with no intent to usurp plaintiff's rights to the horse. The lunging was intended to be done for only about fifteen minutes and in fact lasted only five minutes.
We must, however, factor into our analysis the circumstance that the horse died while the lunging took place. As the Restatement indicates, whether harm has been done to the chattel is a factor to be considered when determining whether a conversion has taken place. Ibid. To give this factor weight, a causal connection must exist between the defendant's conduct in interfering with the chattel and the damage or destruction of the chattel. See 18 Am.Jur.2d Conversion § 2 (2004) (stating that "[t]he view has also been expressed that to establish a conversion claim, a plaintiff must prove that it had a possessory interest in the property, that the defendants intentionally interfered with the plaintiff's possession, and that the defendants' acts were the legal cause of the plaintiff's loss of property"). Here, plaintiff can show no such causal connection between Bridgwood's conduct and the death of the horse. Although the horse did die while it was being lunged by Bridgwood, there is no showing that the lunging, whether done negligently or not, in any way caused the horse's death.
Because no rational factfinder could determine, based on these proofs, that Bridgwood's conduct amounted to conversion of the horse, we affirm the granting of summary judgment in her favor.

III
We now turn to whether Briere stable may be held liable to plaintiff under bailment law. We will first address whether a bailment relationship existed between plaintiff and Briere stable at the time of the horse's death. If it did, then we will consider whether Briere stable is liable under bailment law for the loss of the horse.

A.
A bailment may be created by contract, either express or implied, or by operation of law or statute. Cerreta v. Kinney Corp., 50 N.J.Super. 514, 517, 142 A.2d 917 (App.Div.1958). A bailment arises when a person leaves his chattel on the premises of another "if the latter is given primary control of the chattel for the time being." Moore's Trucking Co. v. Gulf Tire & Supply Co., 18 N.J.Super. 467, 469-70, 87 A.2d 441 (App.Div.) (listing as examples of bailments: "jewelry checked with a swimming pool attendant; diamonds delivered to a retail jeweler `on memorandum' for sale; automobile placed in shop to be washed; airplane stored in a hangar," (citations omitted)), certif. denied, 10 N.J. 22, 89 A.2d 306 (1952); see also State v. Goodmann, 390 N.J.Super. 259, 266-67, 915 A.2d 79 (App.Div.2007) (holding that film left with a store for developing gave rise to a bailment); Jasphy v. Osinsky, 364 N.J.Super. 13, 15, 18, 834 A.2d 426 (App.Div.2003) (noting that a bailment arose when plaintiff left her three fur coats with defendant for storage and cleaning). A bailment has been explained in the following way:

*1147 A bailment is created by the delivery of personal property by one person to another in trust for a specific purpose, pursuant to an express or implied contract to fulfill that trust. Inherent in the bailment relationship is the requirement that the property be returned to the bailor, or duly accounted for by the bailee, when the purpose of the bailment is accomplished, or that it be kept until it is reclaimed by the bailor.
[8A Am.Jur.2d Bailments § 1 (1997).]
Notably, for a bailment to arise, the bailor must have "possession and primary control" over the chattel. City of Jersey City v. Liggett & Myers Tobacco Co., 14 N.J. 112, 115, 101 A.2d 555 (1953). During the bailment arrangement, the bailee has sole custody and control and exclusive possession of the chattel. 8A Am.Jur.2d Bailments § 42 (1997). Nonetheless, the bailee still "must deal with the property during the term of the bailment according to the bailor's instructions." Id. at § 4.
Briere stable denies that a bailment relationship existed because it contends that it did not have complete and exclusive control over the horse. It argues that plaintiff and his family had complete access and control over the horse in that they would ride the horse and transport it to shows at their discretion at any time. It maintains that at most there was joint control of the horse between Briere stable and plaintiff, and hence no bailment arose.
In making this argument, Briere stable relies on Della Cerra v. Burns, 69 N.J.Super. 110, 173 A.2d 564 (App.Div.1961). In that case, the owner of a car had left his vehicle with a garage for repair work. Id. at 113, 173 A.2d 564. In accordance with past practices between the parties, the car was left on the street, unlocked, with the key under the mat, so that the owner could pick it up after hours. Id. at 113-15, 173 A.2d 564. The car was then taken by an unknown person and became involved in an automobile accident. Id. at 112-13, 173 A.2d 564. The court determined that under the circumstances, the garage did not have primary control over the car. Id. at 120, 173 A.2d 564. Rather, the garage and owner had joint control over the car at the time of the theft, and hence, there was no bailment. Ibid. By analogy, Briere stable attempts to argue that it and plaintiff had joint control over the horse and hence no bailment existed. Della Cerra would be analogous here if, with plaintiff's consent, the horse had been left tied to a post on the side of road outside Briere's property waiting for plaintiff to pick it up. That of course did not happen here. At the time this horse died, it was residing at Briere stable solely under the care of Briere stable. Briere stable provided it with shelter, food, water, training, grooming, and on occasion arranged for its medical care and shoeing. Plaintiff was not present at the time to exercise any control over the horse. Accordingly, we conclude that when plaintiff delivered his horse to Briere stable and left it in Briere stable's care for safekeeping, a bailment arrangement arose.
Certainly, at the times when plaintiff had removed the horse from the stable, Briere stable no longer had physical possession and control of the animal, and the bailment relationship was suspended or temporarily terminated. However, once plaintiff returned the horse to the stable and he and his family left, his actual possessory control over the horse reverted to Briere stable which once again assumed its exclusive actual possession and primary control over the animal, and the bailment resumed.

B.
Since a bailment relationship existed at the time the horse died, we must *1148 now consider whether, under the facts presented, Briere stable is liable for the loss. A bailee is not an insurer of the goods. 8A Am.Jur.2d. Bailments § 82 (1997). However, where goods subject to a bailment are not returned or are damaged or lost, the bailor may be able to recover under theories of either conversion or negligence. Lembaga Enters., Inc. v. Cace Trucking & Warehouse, Inc., 320 N.J.Super. 501, 507, 727 A.2d 1026 (App.Div.), certif. denied, 161 N.J. 334, 736 A.2d 527 (1999).
We will first address whether Briere stable can be held liable under a conversion theory applicable to bailees. A bailee commits the tort of common law conversion when it commits "an unauthorized act of dominion over the bailor's property inconsistent with its rights in that property." Ibid. A bailee's intentional or negligent conduct can give rise to a claim of conversion, even though it acted in good faith. Ibid. For example, a bailee will be liable for conversion due to its negligent conduct if the bailee "mistakenly destroys or disposes of the goods ... although there is no intent to steal or destroy the goods." Ibid.
The bailor's "proof of delivery, demand and failure to return the goods" gives rise to "a prima facie case of conversion." Charles Bloom & Co. v. Echo Jewelers, 279 N.J.Super. 372, 381, 652 A.2d 1238 (App.Div.1995). Once a prima facie case is established, the bailee then has the burden of producing evidence to show what happened to the goods. Ibid. Without this rule, the bailor, who was not in possession of the goods, would be in a difficult position to show what occurred. Ibid. As one court has explained:
A bailee who accepts responsibility for goods should have the burden of producing evidence as to the fate of those goods. To hold otherwise would place an impossible burden on a plaintiff. How is a plaintiff to present sufficient evidence of conversion when knowledge of the fate of the goods is available only to defendant?
[Joseph H. Reinfeld, Inc. v. Griswold & Bateman Warehouse Co., 189 N.J.Super. 141, 143-44, 458 A.2d 1341 (Law Div.1983) (involving forty cases of whiskey missing from defendant's warehouse).]
However, the burden of proof remains with the bailor. Id. at 144-45, 458 A.2d 1341. Once the bailee has produced evidence explaining what happened to the chattel, the bailor then must prove its claim of conversion. Ibid.
Here plaintiff has made out a prima facie case of conversion in that he delivered the horse and it has not been returned. Briere stable, however, has come forward with proofs establishing the circumstances under which the horse died, namely that it was being exercised by Bridgwood when it reared up, fell, began bleeding profusely from the nose, and died. Plaintiff has come forward with no further proofs to show that Briere stable converted the horse. Further, as noted, Bridgwood's conduct did not constitute conversion, so Briere stable cannot be liable for conversion due to her conduct. The sole fact that Briere stable was unable to return the horse due to its death does not mean it is liable for the loss. See Gouled v. Holwitz, 95 N.J.L. 277, 113 A. 323 (Sup. Ct.1921) (holding that the bailee was not liable for the death of a horse despite the provision in the bailment agreement requiring that the horse be returned in "good condition" where, during the bailment, the horse came down with spinal meningitis and was thereafter shot by an agent from the Society for the Prevention of Cruelty to Animals over the bailee's protest, since an implied condition in the bailment was that the horse would continue to live). Based on this *1149 state of the evidence, plaintiff cannot sustain his ultimate burden of proving that Briere stable is liable under a theory of conversion.
We now turn to whether Briere stable may be held liable under a theory of negligence. In a bailment for mutual benefit, a bailee has a duty to exercise reasonable care for the safekeeping of the subject of the bailment and will be liable for any loss caused by its failure to do so. Charles Bloom & Co. v. Echo Jewelers, supra, 279 N.J.Super. at 380, 652 A.2d 1238. When proofs are presented showing that goods were damaged while in the care of a bailee, a presumption of negligence arises and in those circumstances, a prima facie case is established against the bailee. McGlynn v. Parking Auth. of Newark, 86 N.J. 551, 556, 432 A.2d 99 (1981) (citing Bachman Chocolate Mfg. Co. v. Lehigh Warehouse & Transp. Co., 1 N.J. 239, 242, 62 A.2d 806 (1949) (proof that cocoa beans were damaged when stored in the bailee's warehouse established a prima facie case of negligence against the bailee)). The presumption of negligence, however, may be rebutted by the bailee "with evidence showing that the loss was not caused by his negligence or that he exercised due care." Ibid.; Jasphy v. Osinsky, supra, 364 N.J.Super. at 19, 834 A.2d 426. The burden of proof always remains with the plaintiff. Bachman Chocolate Mfg. Co. v. Lehigh Warehouse & Transp. Co., supra, 1 N.J. at 242, 62 A.2d 806.
As with the conversion claim, here plaintiff made out a prima facie case of negligence by showing that his horse died in Briere stable's care during the bailment. Briere stable then came forward with evidence showing that the horse was undergoing ordinary exercises by a person experienced in handling and exercising horses, when it died. These proofs presented by Briere stable are devoid of any evidence of negligence causing the death of the horse, and thus rebut the presumption of negligence. Plaintiff has failed to come forward with any additional proofs to establish that the horse was negligently exercised or that the exercise was a proximate cause of its death.
Furthermore, even if we were to presume that Briere stable negligently allowed Bridgwood to exercise the horse or that she negligently did so or that a material issue of fact is presented on the question of negligence, there still is no showing that Bridgwood's conduct was a proximate cause of the horse's death. Nor can we presume that proximate cause is present here. The rebuttable presumptions in favor of a bailor against a bailee for negligence or conversion are in place because the chattel is in the exclusive control of the bailee who is in a unique position to explain what happened to the chattel. See Joseph H. Reinfeld, Inc. v. Griswold & Bateman Warehouse Co., supra, 189 N.J.Super. at 143-44, 458 A.2d 1341. Operation of that presumption on the issue of proximate cause in this case makes no sense since determining the cause of death was uniquely within the control of plaintiff. Since plaintiff owned the animal, his consent was required for further examination and a necropsy. Plaintiff still bears the ultimate burden of proof, and under a negligent cause of action, he must show both negligence and that the negligence was a proximate cause of the harm. This he cannot do.
As a result, since no rational factfinder could determine, based on these proofs, that Briere stable was negligent or converted the horse, Briere stable cannot be held liable for the death of the horse under bailment law. Summary judgment in favor of Briere stable was properly granted.
We affirm the grant of summary judgment in favor of defendants and the denial *1150 of plaintiff's motion for partial summary judgment.
NOTES
[1] Summary judgment was also granted to Douglas Gultz and Sherry Gultz who were named in the complaint as the owners of the land where Briere stable is located. Plaintiff does not argue in this appeal that summary judgment was improvidently granted to these two defendants. Hence, we do not address the claims made against them.
[2] The veterinarian did give a differential diagnosis that included a fungal infection in the guttural pouch that could eat through a major artery wall and cause a massive bleed, a tumor or abscess in the lungs that could eat through a major artery and cause a massive bleed, or a fracture in a bone in the head from flipping over backwards.