**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0879-19

IMPACT PROTECTIVE
EQUIPMENT, LLC, and
MARK D. MONICA,

     Plaintiffs-Appellants,

v.

XTECH PROTECTIVE
EQUIPMENT, LLC,
THEODORE A. "TED"
MONICA, JR., BOB
BRODERICK, PETER
COLUCCINI, JOSEPH SKIBA,
NEW YORK FOOTBALL
GIANTS, INC.,

     Defendants-Respondents,

RICHARD "BIG DADDY"
SALGADO, and COASTAL
ADVISORS, LLC,

     Defendants.

_____

Submitted December 7, 2020 – Decided April 14, 2021

Before Judges Messano, Hoffman, and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-0429-18.

Roper & Thyne, LLC, attorneys for appellants (Angela Roper and Kenneth S. Thyne, of counsel and on the briefs).

Meister Seelig & Fein, LLP, attorneys for respondents XTech Protective Equipment, LLC, Theodore A. "Ted" Monica, Jr., Bob Broderick, and Peter Coluccini (Jeffrey Schreiber, on the brief).

McCarter & English, LLP, attorneys for respondents New York Football Giants, Inc., and Joseph Skiba (Richard Hernandez and Scott M. Weingart, on the brief).

PER CURIAM

Plaintiffs Impact Protective Equipment, LCC (Impact) and its CEO, Mark Monica (Mark),[1] appeal from an April 5, 2019 Law Division order dismissing, pursuant to Rule 4:6-2(e), all but one of the claims pled in plaintiffs' amended complaint.[2] We affirm, in part, and reverse and remand, in part. We affirm the

---

[1] For ease of reference, and intending no disrespect, we refer to Mark Monica and his brother, defendant Theodore A. "Ted" Monica, Jr., by their first names.

[2] The April 5, 2019 order became ripe for appeal in September 2019, when the parties entered a stipulation of dismissal with prejudice as to plaintiffs' only remaining claim, which alleged negligent misrepresentation, and the court entered an order dismissing the claims against defendants Salgado and Coastal Advisors for lack of prosecution.

2

dismissal of all claims brought by Mark in his individual capacity; the dismissal of all claims brought against defendants Joseph Skiba and the New York Football Giants, Inc. (the Giants); and the dismissal of Impact's tortious interference with prospective economic advantage claim. We reverse the dismissal of Impact's claims of fraud, unfair competition, conversion, unjust enrichment, civil conspiracy, and aiding and abetting, and remand those claims to the trial court for further proceedings.

I.

Because this appeal comes to us on a Rule 4:6-2(e) motion to dismiss, we accept the facts alleged in the complaint as true, granting plaintiff "every reasonable inference of fact." Green v. Morgan Props., 215 N.J. 431, 452 (2013) (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)). Thus, we begin with a summary of the facts pled by plaintiffs.

In 2001, Mark and Ted formed Impact, a New Jersey limited liability company. Headquartered in Mountain Lakes, Impact commenced business in 2002, but suspended active operations in 2010. Mark served as Impact's president and CEO, while Ted served as vice president and general manager. Impact designed, developed, marketed, and distributed performance equipment for football players, including its signature product – the Impact Performance

3

Pad, a state-of-the-art shoulder pad. At the height of Impact's success, many NFL, college, and high school players wore Impact pads. Notwithstanding its success, Impact suspended operations on November 10, 2010, as the result of taking "on too much debt beyond its capacity to sell shoulder pads to cover the debt." Another important development occurred in 2010, when the U.S. Patent & Trademark Office rejected Mark's application to patent his shoulder pads.

Defendant XTech Protective Equipment, LLC (XTech), a limited liability company formed in June 2012, makes its headquarters in East Hanover. XTech develops state-of-the-art protective performance equipment for athletes, mainly focusing on shoulder pads. Plaintiffs listed XTech's founding members and current principals as defendants Peter Coluccini, president; Bob Broderick, vice president of marketing and sales; and Ted, "in charge of East Coast sales."[3]

The Giants, a New York corporation with its principal place of business in East Rutherford, owns and operates the National Football League franchise of the same name. Skiba, the former equipment director for the Giants, worked for the team from 1994 until 2018. Plaintiffs describe Skiba as secretly involved

---

[3] As of February 19, 2021, XTech's website lists Broderick as President and Ted as Vice President, Design / R&D, but does not mention Coluccini. XTECH PADS, https://xtechpads.com/company (last visited February 17, 2021). For ease of reference, we refer to Coluccini, Broderick, Ted, and XTech as the XTech defendants.

A-0879-19

with XTech, "as either a shareholder or as [a] compensated broker in exchange for his efforts at putting the XTech's principals together and raising investment money for the company."

Coastal Advisors, an insurance agency owned and operated by defendant Richard "Big Daddy" Salgado, specializes in selling insurance and providing estate planning services for athletes and sports figures. Salgado provided funding to Impact until 2004, when Salgado unsuccessfully attempted to force Mark out of Impact. Plaintiffs contend, "Upon information and belief, Salgado is an investor/shareholder in XTech, and/or was compensated for bringing investors to [XTech]"; in addition, he maintained "extensive far-reaching ties to the Giants at all levels, from the equipment staff, to the players, to the coaches, all the way up to and including the Giants' ownership."

In the spring of 2011, about six months after Impact suspended its operations, Mark met with Salgado and began discussing the possible revival of Impact. However, in August 2011, Salgado stated that "he is taking over Impact, and Mark now answers to him[,]" and that "[i]f Mark had a problem working for him, he should say so now and not be a part of the company moving forward." Thereafter, on multiple occasions in the fall of 2011, Salgado made statements that "Mark is out and is going to have to collect his check on a beach

A-0879-19

somewhere."  In October 2011, the Sports Business Journal quoted Salgado as saying that his next big venture was gathering a group of investors to resurrect Impact, with the slogan, "The guy who protects you off the field now protects you on the field."  At that point, no serious discussions had taken place between Mark and Salgado regarding Impact's future, Salgado had no financial interest in Impact, and Salgado was not authorized in any way to speak or act on behalf of Impact.  Salgado's statements and posture towards Mark ultimately soured any possible business relationship between Mark and Salgado.

At some point in 2011 or early 2012, the individual defendants met in the Giants equipment room and "hatched" a scheme to "fraudulently procure Impact's proprietary information under the false pretense of an Impact revival, and then once procured, use Impact's proprietary information to start a new venture (XTech), while leaving Impact and its shareholders in the lurch." Supported by "the behind the scenes urging" of Salgado and Skiba, Broderick, and Coluccini, Ted agreed to form XTech, but despite Ted's "reputation within the industry as a 'rock star equipment guru,' the conspirators had no substance upon which to base their new venture."  Thus, these defendants "orchestrated a conspiracy where they would misappropriate Impact's proprietary information, inclusive of the vendor list, the customer list, the product construction and

design, and other proprietary information, by engaging Mark . . . to disclose that information under the false pretense that they were going to restart Impact."

In early 2012, Ted sent Mark a text requesting to "[p]ut this behind us and move forward for the good of [Impact]." In February 2012, Ted represented that his new contact, Broderick, a financial consultant, had a client "interested in researching a possible investment in the Impact revival." On March 12, 2012, Mark and his associate, Elgin Clemons, met with defendants Broderick, Coluccini, and Ted. At this meeting, Coluccini stated "he had an unnamed mystery investor who was interested in the revival of Impact." Coluccini also discussed the attendees' future roles in a revived Impact: Ted "would remain in the building and work on the technical aspects, Mark would go on the road to do sales, Broderick would do the marketing, and Coluccini would bring in the money." To further this project, Coluccini stated that he needed "Impact's complete financials, all documentation, lists, costs, and any other documents relating to Impact's business." From plaintiffs' perspective, the meeting concluded with all parties agreeing "to move forward to attempt to relaunch Impact and provide the potential investor(s) represented by Coluccini with updated information."

A-0879-19

Over the next month through April 2012, Mark sent Broderick, Coluccini, and Ted "a series of proprietary Impact documents" including, but not limited to

> answers to questions asked for seed financing, list of Impact suppliers, Impact past sales numbers, Impact customer list, Impact vendor list, Impact financials, Impact internet orders, Impact NFL sales, Impact NCAA sales, Impact Interscholastic sales, Impact list of manufacturing reps, [b]ill of materials, product costing, and other assorted documents pertaining to Mark Monica's opinion on strategy moving forward.

Throughout the spring of 2012, Broderick, Coluccini, and Ted scheduled multiple meetings with plaintiffs to discuss Impact, but they either cancelled each meeting or failed to show up. At the same time, Salgado scheduled multiple meetings with Clemons to meet an alleged prospective investor in Impact, but Salgado also failed to attend, rescheduled, or cancelled these meetings. Beginning in late May 2012, Broderick, Coluccini, Ted, and Salgado thwarted plaintiffs' attempts to contact them.

In July 2012, Ted contacted both Clemons and Impact's legal counsel, requesting "a letter from Impact on Impact letterhead releasing him from any obligation to Impact, because nobody [would] hire him." Ted also requested a copy of Impact's Operating Agreement, allegedly for estate planning services. In early August 2012, an attorney named Mitchell Schuster also contacted

8

Clemons, claiming Ted retained him for estate planning purposes, and requesting a copy of Impact's Operating Agreement. Mark later discovered Schuster's law firm was in the same building as Salgado's Coastal Advisors, which meant "[o]bviously, Salgado connected Ted . . . to Schuster."

On August 29, 2012, Clemons called Ted to confront him about his suspicious relationship with Salgado and Schuster. During this phone call, Ted "denied any association with Salgado, and stated that he is not working in concert with Salgado, Coluccini, and Broderick to restart Impact without Mark[.]" Around this time, Coluccini told Mark and Clemons that "there was an investor conflict and he had to find a new investor."

Unbeknownst to plaintiffs, Broderick, Coluccini, and Ted had formed XTech in June 2012. Indeed, Ted's biography on XTech's website states, "[Ted] returned to the protective equipment industry full-time in June 2012, when he joined XTech Protective Equipment and helped launch the XTech shoulder pad." Schuster, the attorney supposedly handling Ted's estate planning, filed XTech's trademark on August 20, 2013.

By the fall of 2012, XTech began prototyping and manufacturing "test pads," which, thanks to Skiba, the Giants' players wore for the entirety of the 2013 NFL season. Throughout 2013, the XTech defendants made sales calls

A-0879-19

and visits to various NFL equipment managers attempting to sell XTech's new shoulder pads. In multiple sales presentations, Ted reportedly stated, "I took everything that was good about Impact, and put it in this pad. This pad is just like Impact, only better."

Plaintiffs' amended complaint asserts:

[T]he XTech pad was an exact copy of the Impact pad:

a. The pads were originally manufactured in a white plastic outer shell. The interior padding has a white fabric outer layer (visible) when the player is wearing the pad, and a black moisture wicking inner fabric layer. Impact was the first company to do this solely in production.

b. The belt and buckle system are attached using a single rivet to allow for the entire system to "swivel" and fall naturally on the player's body for comfort, rather than a three-point rivet attachment system that is stationary and provides no movement and a predetermined angle of degree on the players body. Impact was the first company to do this in production.

c. The interior foam padding that is beneath the outer layers of black and white fabric are open celled in nature which allows for increased air flow and liquid absorbing capabilities (i.e. perspiration) with additional ventilation holes. It is also layered, using two or more different foams to increase protection. Impact was the first company to do this in production.

A-0879-19

d. The outer plastic shell has ventilation holes or other geometric shapes to provide for increased air flow to cool the body faster by evaporative cooling. Impact was the first to do this in production and reduce weight.

e. The two "halves" of the shoulder pad are attached using a "swivel" plate system to allow for greater player movement. Impact used a four point system.

f. Impact invented the optional "padded belt slide" that XTech offers today. It is the exact same shape as Impact's padded belt slide, which was Impact's #1 selling accessory.

g. Impact used a "round" pad behind the buckle and sewn the padding to the buckle. Impact was the first to sew the pad to the buckle.

h. The XRD foam that XTech is using, and that Broderick falsely claims to have discovered on Google, was introduced to Impact by Under Armour. At the time, XRD had a two-year exclusive with either Rawlings or Bike, and would not let Impact use the foam. Impact was going to replace its visco elastic foam with the XRD foam once Impact depleted its inventory of visco elastic foam, and the two-year exclusive ended.

i. Impact was the first company to mold the plastic outer shell in multiple pieces and connect them to make one piece.

j. XTech's backplates look exactly like the pad that Mark Monica designed for Under Armour. He

11

A-0879-19

still has a drawing of the pad, as well as the Nike one.

    k.  XTech also makes claims of "body cooling", "air-flow", and "protective capabilities" that are identical to principles upon which Impact was founded. The first XTech shoulder pad was identical to the Impact pad, and was used by XTech to buy time to design and build XTech's final version.

    l.  Even XTech's signature 'shock and awe' presentation where Broderick covers his hand with the XTech padding, and then smashes a football helmet full force onto his hand, only to emerge unscathed, was directly ripped-off from Impact's presentation developed years earlier.

Plaintiffs allege that defendants' wrongful usurpation of Impact's proprietary information "permanently crippled [Impact] with no hope of recovery or revival, . . . destroyed Impact's ability to raise money, and likewise destroyed Impact's ability to resurrect its deal with Under Armour which was in the works at the time Impact suspended operations." Because of defendants' wrongful conduct, plaintiffs lost the opportunity to revive Impact, which at one point was valued at more than thirty million dollars, and the money of Impacts' numerous investors "is lost without hope of recovery from an Impact revival." In addition, "[Mark]'s standing and reputation within his chosen industry has been destroyed," and he "has also been deprived of the expected fruits emanating

A-0879-19

from Impact's revival including the restoration of his reputation in the industry, lost income, lost profits, and other benefits."

II.

Plaintiffs filed their initial complaint on May 6, 2018, alleging the following claims: breach of fiduciary duty (count one); common law fraud (count two); fraudulent concealment (count three); negligent misrepresentation (count four); tortious interference with prospective economic advantage (count five); unfair competition and trade secret misappropriation at common law and under N.J.S.A. 56:4-1 (count six); conversion (count seven); quasi contractual unjust enrichment (count eight); civil conspiracy (count nine); aiding and abetting (count ten); negligent supervision (count eleven); and respondent superior (count twelve). On November 7, 2018, the motion judge dismissed counts seven, nine, and eleven with prejudice and the remaining counts without prejudice, allowing plaintiffs leave to amend their complaint to cure the counts dismissed without prejudice. The judge also found that Mark lacked standing to sue in his individual capacity because the complaint failed to articulate he suffered a special injury beyond that to Impact and failed to allege demand or demand futility.

A-0879-19

On December 6, 2018, plaintiffs filed their amended complaint, asserting the same claims as their initial complaint but omitting count one, the breach of fiduciary duty claim against Ted. The amended complaint contained the following counts against the XTech defendants: common law fraud (count one), fraudulent concealment (count two), and negligent misrepresentation (count three); the following counts against all defendants: tortious interference with prospective economic advantage (count four), unfair competition and trade secret misappropriation under N.J.S.A. 56:4-1 (count five), conversion (count six), quasi-contractual unjust enrichment (count seven); civil conspiracy (count eight), aiding and abetting (count nine); negligent supervision against the Giants (count ten), and respondeat superior against XTech, the Giants, and Coastal Advisors (count eleven).

On December 20, 2018, the XTech defendants moved to dismiss the amended complaint, and the following week, Skiba and the Giants likewise moved to dismiss. On January 17, 2019, plaintiffs cross-moved for reconsideration regarding the claims in the original complaint that were dismissed with prejudice. The first motion judge denied this cross-motion for reconsideration on March 20, 2019.

On April 5, 2019, another judge (the second motion judge) granted, in large part, defendants' motions to dismiss plaintiffs' amended complaint. The judge dismissed all of plaintiffs' claims except for plaintiffs' negligent misrepresentation claim against the XTech defendants. The judge also found that Mark lacked standing to sue in his individual capacity because he had not suffered a special injury, despite plaintiffs amending their complaint to specifically allege special injury to Mark and demand futility.

The XTech defendants filed an answer to this remaining count on May 10, 2019. Thereafter, on September 25, 2019, plaintiffs and the XTech defendants entered into a stipulation of dismissal with prejudice as to the remaining negligent misrepresentation count.

This appeal followed, with plaintiffs challenging the dismissal of their conversion, civil conspiracy, and negligent supervision claims with prejudice, and the dismissal of their remaining claims without prejudice. Plaintiffs contend they pled sufficient facts to warrant the denial of defendants' Rule 4:6-2(e) dismissal motions.

III.

Rule 4:6-2(e) provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted[.]" This Rule tests "the legal

sufficiency of the facts alleged on the face of the complaint." Printing Mart, 116 N.J. at 746.

We apply a de novo standard when reviewing a dismissal of a complaint for failure to state a claim under Rule 4:6-2(e). MTK Food Servs., Inc. v. Sirius Am. Ins. Co., 455 N.J. Super 307, 311 (App. Div. 2018). "[O]ur inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint." Printing Mart, 116 N.J. at 746. "At this preliminary stage of the litigation[,]" we are "not concerned with the ability of plaintiffs to prove the allegation contained in the complaint." Ibid. Rather, "we accept as true the facts alleged in the complaint[,]" and afford plaintiffs "every reasonable inference in their favor." Craig v. Suburban Cablevision, 140 N.J. 623, 625-26 (1995). Nevertheless, we will "dismiss the plaintiff's complaint if it has failed to articulate a legal basis entitling plaintiff to relief." Sickles v. Cabot Corp., 379 N.J. Super. 100, 106 (App. Div. 2005).

On a motion to dismiss, a plaintiff need not prove the case, but need only "make allegations which, if proven, would constitute a valid cause of action." Kieffer v. High Point Ins. Co., 422 N.J. Super. 38, 43 (App. Div. 2011) (quoting Leon v. Rite Aid Corp., 340 N.J. Super. 462, 472 (App. Div. 2001)). On such a motion, plaintiff is entitled to "every reasonable inference of fact." Printing

16

Mart, 116 N.J. at 746 (citing <u>Indep. Dairy Workers Union v. Milk Drivers Local 680</u>, 23 N.J. 85, 89 (1956)).

A reviewing court must "search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." <u>Ibid.</u> (quoting <u>Di Cristofaro v. Laurel Grove Mem. Park</u>, 43 N.J. Super. 244, 252 (App. Div. 1957)). This review should be "at once painstaking and undertaken with a generous and hospitable approach." <u>Ibid.</u>

A motion to dismiss should only be granted in "the rarest of instances." <u>Kieffer</u>, 422 N.J. Super. at 43 (quoting <u>Printing Mart</u>, 116 N.J. at 771-72). Only where "even a generous reading of the allegations does not reveal a legal basis for recovery" should the motion be granted. <u>Ibid.</u> (quoting <u>Edwards v. Prudential Prop. & Cas. Co.</u>, 357 N.J. Super. 196, 202 (App. Div. 2003)).

Because we conclude the first motion judge mistakenly dismissed three counts of plaintiffs' initial complaint with prejudice without affording an opportunity to amend, <u>see</u> <u>Printing Mart</u>, 116 N.J. at 746, and since plaintiffs included those counts in their amended complaint, our review focuses on plaintiffs' amended complaint.

17

Plaintiff Mark Monica's Standing

Plaintiffs first challenge the finding that Mark lacked standing to sue in his individual capacity. Plaintiffs argue that Mark suffered "a special injury" separate and apart from the damages sustained by Impact and its members, contending he "invented the concept of a breathable shoulder pad with visco-elastic dry polymer foam." This "special injury," in turn, entitled Mark to bring a direct action against defendants. This argument lacks merit.

The Revised Uniform Limited Liability Company Act restricts the ability of an LLC member to assert claims that belong to the LLC. N.J.S.A. 42:2C-67 to -68. In that respect, it is similar to corporation law, which restricts a corporation's shareholder from asserting claims of the corporation. See Pepe v. Gen. Motors Acceptance Corp., 254 N.J. Super. 662, 666 (App. Div. 1992) ("The law is clear and uniform: shareholders cannot sue for injuries arising from the diminution in value of their shareholdings resulting from wrongs allegedly done to their corporations. Nor can stockholders assert individual claims for . . . other income lost because of injuries assertedly done to their corporations." (citations omitted)); see also Brown v. Brown, 323 N.J. Super. 30, 36 (App. Div. 1999) (distinguishing between derivative actions which are conditioned on

18

injury or breach of duty to the corporation, and direct actions, involving injury sustained by, or violating a duty owed to a shareholder).

Under N.J.S.A. 42:2C-67, to "maintain a direct action against another member, a manager, or the limited liability company to enforce the member's rights and otherwise protect the member's interests," a member of an LLC must "plead and prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company." On the other hand, an LLC member "may maintain a derivative action to enforce a right of a limited liability company if the company . . . [does] not bring the action within a reasonable time." N.J.S.A. 42:2C-68(a). When determining whether the action is a direct or derivative claim, courts look at the nature of the wrong alleged in the complaint and not the designation or claimed intent of the plaintiff. Strasenburgh v. Straubmuller, 146 N.J. 527, 551 (1996).

The second motion judge determined plaintiffs' amended complaint did not sufficiently describe a special injury to Mark, and therefore, he lacked standing to bring a direct suit. The amended complaint's allegation of special injury to Mark contended that defendants destroyed his reputation in the shoulder pad industry and as president and CEO of Impact; in addition, defendants "deprived [Mark] of the expected fruits emanating from Impact's

revival[,] including the restoration of his reputation in the industry, lost income, lost profits, and other benefits." The judge found these assertions did not rise to the level of special injury because the injuries Mark suffered arose out of injuries to Impact as a whole, which "would have depressed the stock value for all [members] of Impact[.]"

We affirm the judge's determination that Mark lacked standing to bring a direct suit. The wrongs alleged, namely the fraudulent misappropriation and use of Impact's proprietary information, constituted wrongs to Impact, and any injury Mark suffered flowed from the injury to Impact. The wrongs allegedly inflicted on Impact negatively impacted the economic prospects of all members of Impact, rendering Mark's claims derivative.

Plaintiffs also argue Mark has standing to sue in his individual capacity because their amended complaint established the requirements for Mark to bring a derivative action on behalf of Impact. We disagree.

N.J.S.A. 42:2C-68(a) provides that a member may bring a derivative action on behalf of the LCC if "the managers or other members do not bring the action within a reasonable time[.]" Here, Impact brings the exact same causes of action as Mark attempts to bring as an individual. Mark therefore cannot claim Impact failed to bring an action to enforce its rights within reasonable

20

time, a prerequisite for a member to maintain a derivative suit. Therefore, Mark lacks standing as an individual to bring either a direct or derivative suit against defendants.

Impact's Common Law Fraud Claim

Plaintiffs assert they pled sufficient facts to support a claim for common law fraud against the XTech defendants. We agree.

The elements of common law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 172-73 (2005) (quoting Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997)). Each element requires proof by "clear and convincing evidence." DepoLink Court v. Rochman, 430 N.J. Super. 325, 336 (App. Div. 2013).

A claim for common law fraud "must relate to a present or preexisting fact and cannot ordinarily be predicated on representations [that] involve things to be done in the future." Anderson v. Modica, 4 N.J. 383, 391-92 (1950). However, "a present intention to act or not act in the future" can constitute an actionable misrepresentation if the person making the representation did not

A-0879-19

intend to act, or not act, when the statement was made. <u>Stochastic Decisions, Inc. v. DiDomenico</u>, 236 N.J. Super. 388, 395-96 (App. Div. 1989) (citing <u>Van Dam Egg Co. v. Allendale Farms, Inc.</u>, 199 N.J. Super. 452, 457 (App. Div. 1985) ("A promise to pay in the future is fraudulent if there is no present intent ever to do so.")).

The second motion judge concluded that the facts alleged in plaintiffs' amended complaint did not state a claim for common law fraud. He determined that plaintiffs' belief that the XTech defendants wanted to revive Impact was based solely on Coluccini's statement describing a potential mystery investor interested in reviving the company, and that this constituted a non-actionable promise of future intent. We do not agree that plaintiffs based their claim solely upon Coluccini's potential mystery investor.

Assuming the facts alleged by plaintiffs are true, and affording them all reasonable inferences, we conclude plaintiffs adequately pled a cause of action for common law fraud against the XTech defendants. The amended complaint describes the XTech defendants making a series of intentional misrepresentations, beyond Coluccini's one statement, designed to trick plaintiffs into providing them with Impact's confidential proprietary information.

A-0879-19

Plaintiffs' complaint recounts two communications from Ted to Mark in early 2012 where Ted requested to "'[p]ut this behind us and move forward for the good of the company'" and "represented that to help fund Impact he had a new contact . . . interested in researching a possible investment in the Impact revival." The parties set up a meeting based on these communications; during the meeting, Coluccini discussed the roles the parties would play in a revived Impact and the documents needed to make the revival happen. Plaintiffs allege they relied on the representations made during the meeting, where "all parties agreed to move forward to attempt to re-launch Impact[.]" Thereafter, the XTech defendants scheduled meetings in April and May of 2012 to discuss Impact's future, and then cancelled those meetings. The statements and actions of the XTech defendants constitute representations of their then-present intent to revive Impact with plaintiffs.

We reject the conclusion that the misrepresentations made by the XTech defendants concerned a future intent and not a presently existing fact. Plaintiffs alleged that, in the early part of 2012, the XTech defendants approached Mark and made representations of their intent to restart Impact, assisted by investors interested in such a venture. These were "false state of mind" representations, which are actionable as fraud at common law. Ocean Cape Hotel Corp. v.

23

<u>Masefield Corp.</u>, 63 N.J. Super. 369, 380 (App. Div. 1960). The XTech defendants represented they intended to restart Impact along with plaintiffs, but to do so, they needed plaintiffs to provide Impact's proprietary information. The XTech defendants intended plaintiffs would rely on these statements and reasonably foresaw that such reliance would occur. As a result, plaintiffs suffered damages in the form of the XTech defendants acquiring Impact's proprietary information without compensation. Since these facts as alleged in plaintiffs' amended complaint establish the elements of common law fraud, we reverse the <u>Rule</u> 4:6-2(e) dismissal of this claim.

<u>Impact's Tortious Interference with Prospective Economic Advantage Claim</u>

Plaintiffs contend they pled sufficient facts for Impact to assert a viable claim of tortious interference with prospective economic advantage. We disagree.

Actions for tortious interference with prospective economic advantage safeguard "the right to pursue one's business, calling, or occupation, free from undue influence or molestation. Not only does the law protect a party's interest in a contract already made, but it also protects a party's interest in reasonable expectations of economic advantage." <u>Lamorte Burns & Co. v. Walters</u>, 167

N.J. 285, 305 (2001) (internal citations omitted).  To survive a motion to dismiss, a complaint of tortious interference must allege

> facts that show some protectable right – a prospective economic or contractual relationship.  Although the right need not equate with that found in an enforceable contract, there must be allegations of fact giving rise to some reasonable expectation of economic advantage. A complaint must demonstrate that a plaintiff was in "pursuit" of business.  Second, the complaint must allege facts claiming that the interference was done intentionally and with malice.  For purposes of this tort, "[t]he term malice is not used in the literal sense requiring ill will toward the plaintiff."  Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse.  Third, the complaint must allege facts leading to the conclusion that the interference caused the loss of the prospective gain.  A plaintiff must show that if there had been no interference[,] there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits. Fourth, the complaint must allege that the injury caused damage.
>
> [Printing Mart, 116 N.J. at 751-52 (alterations in original) (internal quotations and citations omitted).]

Additionally, "it is fundamental to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship."  Id. at 752 (internal citations and quotation marks omitted).

Plaintiffs' amended complaint asserts a "protectable interest of prospective economic advantage" in "[p]laintiffs' right to pursue their lawful business, specifically, the revival of Impact." In dismissing this claim, the judge determined plaintiffs' claimed expectation of economic success was too speculative, and "would necessitate a finding that the [p]laintiffs economic prospects were both created and interfered with at the same meeting, sixteen months after suspending operations." Additionally, the judge determined the complaint did not properly allege causation between defendants' misconduct and Impact's failure to resume operations or obtain other economic benefits.

We also conclude that plaintiffs' complaint does not establish the essential facts to support a cause of action for tortious interference with prospective economic advantage. The complaint fails to satisfy the causation requirement to establish tortious interference because it fails to allege plaintiffs would have received any economic benefit had there been no interference by defendants. The complaint does not state that plaintiffs would have or could have revived Impact without defendant's involvement. From the facts alleged in the complaint, Impact was inactive and would have remained inactive even if defendants had not, as plaintiffs allege, fraudulently induced plaintiffs to give up Impact's proprietary business information. As pled, the XTech defendants

26

constituted the sole reason for plaintiffs' prospective opportunity of reviving Impact. Plaintiffs cannot assert a tortious interference claim against the party that constituted the prospective economic advantage.

Impact's Unfair Competition and Trade Secret Misappropriation Claims

Plaintiffs next argue their amended complaint states a claim for unfair competition and trade secret misappropriation at common law and under N.J.S.A. 56:4-1. We agree that their amended complaint states a claim for unfair competition at common law, but conclude it does not state a claim for statutory misappropriation.

At common law, the business tort of unfair competition remains "an 'amorphous' area of law . . . generally defined as the 'misappropriation of one's property by another . . . which has some sort of commercial or pecuniary value.'" ADP, LLC v. Kusins, 460 N.J. Super. 368, 414 (2019) (quoting Duffy v. Charles Schwab & Co., 97 F.Supp.2d 592, 600 (D.N.J. 2000)). See also Columbia Broad. Sys. Inc. v. Melody Recordings, Inc., 134 N.J. Super. 368, 377 (App. Div. 1975) (finding defendants engaged in unfair competition as a matter of law by rerecording original recorded musical performances and selling the duplicates). The tort broadly focuses on "fair play," and aims "to promote higher ethical standards in the business world." Ryan v. Carmona Bolen Home for

27

<u>Funerals</u>, 341 N.J. Super. 87, 92 (App. Div. 2001).  Unfair competition is "as flexible and elastic as the evolving standards of commercial morality demand." <u>Ibid.</u>

According to our Supreme Court, the "taking of . . . confidential and proprietary property and then using it effectively to target plaintiffs' clients[ ] is contrary to the notion of free competition that is fair."  <u>Lamorte Burns & Co. v. Walters</u>, 167 N.J. 285, 309 (2001).  A company's "information need not rise to the level of a trade secret to be protected" from misappropriation; it "may otherwise be publicly available."  <u>Id.</u> at 299.  Ultimately, "[t]he key to determining the misuse of information is the relationship of the parties at the time of disclosure and the intended use of the information."  <u>Ibid.</u>  In <u>Lamorte Burns</u>, two employees, one of whom had a restrictive covenant, left the plaintiff company to establish a new business and compete directly with their former employer.  <u>Id.</u> at 291-93.  In doing so, the former employees developed a targeted solicitation list based on information from their former employer's client files.  <u>Ibid.</u>  The Court found this conduct contrary to the notion of fair competition.  <u>Id.</u> at 309.

N.J.S.A. 56:4-1 provides, "No merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or

goodwill of any maker in whose product such merchant, firm or corporation deals." This statute "applies specifically to situations involving the wrongful appropriation or misuse of trademarks, names, brands, good-will and the like, as well as false, misleading or deceptive advertisement of products and certain pricing practices." Melody Recordings, 134 N.J. Super. at 375. Numerous federal cases have held that N.J.S.A. 56:4-1 is identical to the federal Lanham Act, 15 U.S.C. 1125(a)(1)(B), which creates civil liability for trademark infringement. See, e.g., Buying for the Home, LLC v. Humble Abode, LLC, 459 F.Supp.2d 310, 317 (D.N.J. 2006). However, the statute leaves undisturbed and does not "attempt to regulate different unfair business practices which historically have been reached by common law precepts." Melody Recordings, 134 N.J. Super. at 375.

The second motion judge dismissed Impact's unfair competition claim because Impact's shoulder pad technology was not patented, noting the U.S. Patents and Trademarks Office deemed Mark's patent abandoned in January 2010. In addition, Impact was non-operational when the alleged misappropriation occurred and "was not due any special protections simply because a competitor entered the field."

A-0879-19

In our view, plaintiffs' complaint states a claim for unfair competition at common law.[4]  The complaint alleges the information plaintiffs sent to Broderick, Coluccini, and Ted constituted confidential and proprietary information based on the relationship of the parties involved and the intended use of the information.  Plaintiffs sent this information to these defendants under the belief they were business partners in reviving XTech.  Impact would not have provided this information but for defendants' misrepresentations.  Even if this information was not patented, plaintiffs allege the XTech defendants obtained this information through fraudulent means and by exploiting their feigned relationship with Impact.  If proven, such conduct would not represent fair competition among rival businesses, but rather dishonest conduct that runs contrary to the notion fair competition.

Plaintiffs' amended complaint does not, however, state a claim for statutory unfair competition under N.J.S.A. 56:4-1.  Plaintiffs do not allege that XTech attempted to pass off their products as Impact's, claimed an affiliation with Impact, or wrongfully used Impact's brand.  The facts alleged do not

---

[4]  The amended complaint broadly aims this claim at "[d]efendants."  Though we find the complaint does present a viable cause of action for unfair competition, the facts alleged only support such a claim against the XTech defendants.

establish trademark infringement and thus, the statutory claim was properly dismissed.

## Impact's Conversion Claim

Plaintiffs argue they properly pled a claim for conversion, and this claim should not have been dismissed. We agree.

Plaintiffs' initial complaint alleged defendants "willfully exercised dominion over [p]laintiffs' property, to the exclusion of [p]laintiffs' rights to their property, to wit, [p]laintiffs' pad design, technology, and trade secrets." The first motion judge dismissed this conversion claim with prejudice because the complaint did not allege defendants converted plaintiffs' tangible property, and New Jersey does not recognize conversion claims for intangible property.

Plaintiffs' amended complaint alleged defendants "willfully exercised dominion over [p]laintiffs' property, to the exclusion of [p]laintiffs' rights to their property, to wit, [p]laintiffs' pad design, technology, trade secrets, and other tangible property listed in [p]aragraph [forty-five]." (emphasis added). Paragraph forty-five lists the "proprietary Impact documents" forwarded to Broderick, Coluccini, and Ted following the March 2012 meeting:

> These documents included, but were not limited to: answers to questions asked for seed financing, list of Impact suppliers, Impact past sales numbers, Impact customer list, Impact vendor list, Impact financials,

31

Impact internet orders, Impact NFL sales, Impact NCAA sales, Impact Interscholastic sales, Impact list of manufacturing reps, Bill of materials, product costing, and other assorted documents pertaining to Mark Monica's opinion on strategy moving forward.

The second motion judge dismissed this count, finding plaintiffs barred from bringing a conversion claim after the first motion judge's dismissal with prejudice, and concurring that New Jersey law does not allow claims of conversion of intangible property.

The tort of conversion is the "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Chicago Title Ins. Co. v. Ellis, 409 N.J. Super. 444, 454 (App. Div. 2009) (quoting Restatement (Second) of Torts § 222A(1) (Am. Law Inst. 1965)). However, "the mere use of the property of another without permission of the owner does not necessarily amount to conversion." LaPlace v. Briere, 404 N.J. Super. 585, 595 (App. Div. 2009). "To constitute a conversion of goods, there must be some repudiation by the defendant of the owner's right, or some exercise of dominion over them by him inconsistent with such right, or some act done which has the effect of destroying or changing the quality of the chattel." Id. at 596 (quoting Frome v. Dennis, 45 N.J.L. 515, 516 (Sup. Ct. 1883)).

A-0879-19

We are satisfied that plaintiffs' amended complaint established the essential facts to support a cause of action for conversion.[5] The allegedly converted property referenced in the amended complaint encompassed more than mere intangible and intellectual property; it included actual documents containing customer lists, supplier lists, costing information, and sales information. Plaintiffs' complaint alleges XTech used these documents to solicit and form relationships with Impact's former customers, which enabled XTech to take over the market space formerly occupied by Impact. Because XTech's alleged use of these documents seriously interfered with Impact's use and control of them, and significantly diminished their value to Impact, Impact asserted, at the pleading stage, a viable claim for conversion, seeking compensation for the diminution in value of these documents against the XTech defendants. Discovery can be expected to illuminate whether the conduct of the XTech defendants "destroy[ed] or chang[ed] the quality" of XTech's documents and lists. LaPlace, 404 N.J. Super. at 596.

---

[5] The amended complaint broadly aims this claim at "[d]efendants." Though we find the complaint does present a viable cause of action for conversion, the facts alleged only support such a claim against the XTech defendants.

<u>Impact's Unjust Enrichment Claim</u>

Plaintiffs argue their amended complaint states a claim for recovery under the quasi-contractual theory of unjust enrichment.  We agree.

When parties do not have an express contract governing their relationship, the law allows for quasi-contractual remedies, such as unjust enrichment.  <u>N.Y.-Conn. Dev. Corp. v. Blinds-To-Go (U.S.), Inc.</u>, 449 N.J. Super. 542, 556 (App. Div. 2017).  Courts may grant relief on the basis of unjust enrichment if a plaintiff establishes that it conferred a benefit upon a defendant, and it would be unjust to allow the defendant to retain it.  <u>VRG Corp. v. GKN Realty Corp.</u>, 135 N.J. 539, 554 (1994).  Liability will only be imposed if the "plaintiff expected remuneration from the defendant, or if the true facts were known to [the] plaintiff, he would have expected remuneration from [the] defendant, at the time the benefit was conferred."  <u>Castro v. NYT Television</u>, 370 N.J. Super. 282, 299 (App. Div. 2004) (quoting <u>Callano v. Oakwood Park Homes Corp.</u>, 91 N.J. Super. 105, 109 (App. Div. 1966)).

The second motion judge found plaintiffs' complaint failed to state a claim for unjust enrichment because "[a] claim for unjust enrichment cannot survive where a contract is in place that governs the parties' rights."  Since "as an LLC, Impact was required to have some form of an Operating Agreement or other

34

controlling document," and plaintiffs "failed to allege that a document setting forth the relationship between Plaintiff and Defendants does or does not exist[,]" the second motion judge determined dismissal was in order.[6]

We reject the conclusion that the existence of an operating agreement bars Impact from asserting a quasi-contractual unjust enrichment claim. If this agreement exists, it would only establish a contractual relationship between Impact and Ted, who was one of two members of Impact. Since the other defendants were not members or employees of Impact, the operating agreement would not address their relationship with Impact. It is also not certain that the operating agreement's terms would cover such a dispute between Ted and Impact, or if the operating agreement is still applicable, as Impact has been nonoperational since 2010.

Regardless, we find the complaint states a claim for unjust enrichment.[7] The complaint alleges that plaintiffs provided Broderick, Coluccini, and Ted with Impact's confidential and proprietary information with the expectation that

---

[6] The second motion judge's opinion notes that while defendants argued that Impact's operating agreement precluded plaintiffs from bringing an unjust enrichment claim, neither party produced a copy of this agreement.

[7] While the amended complaint asserts this claim against "[d]efendants[,]" we conclude plaintiffs pled a viable cause of action for quasi-contractual unjust enrichment only against the XTech defendants.

these defendants would work on behalf of Impact to revitalize the company. This did not occur, and instead, these defendants used Impact's information to form XTech to the exclusion of plaintiffs. If plaintiffs had known defendants planned to exclude them from their planned venture, they would have expected renumeration in exchange for providing defendants with the information. Plainly, the allegations pled by plaintiffs describe defendants inducing plaintiffs to confer upon them a benefit under false pretenses, and therefore it would be unjust for defendants to retain it without compensating plaintiffs. We are satisfied plaintiffs pled a viable unjust enrichment claim under a quasi-contractual theory against the XTech defendants.

### Dismissal of Impact's Claims Against Skiba

The second motion judge found the complaint devoid of facts establishing any wrongdoing by Skiba, and its allegations that Skiba was involved in the conspiracy against Impact to be entirely conclusory. Plaintiffs argue the complaint properly joined Skiba as a defendant, and Impact's claims against Skiba should not have been dismissed. We affirm the dismissal of all claims against Skiba.

The complaint alleges Skiba introduced Broderick, Coluccini, and Ted, enabled them to meet at the Giants' facilities, and urged them to start XTech. It

further vaguely provides "[u]pon information and belief, Skiba was compensated by [XTech] for his efforts in putting the company together and raising money for [XTech]" and suggests Skiba may secretly be a shareholder in XTech. Even accepting these speculative allegations as true, the complaint does not describe Skiba engaging in any wrongdoing or participating in the conspiracy to misappropriate Impact's confidential information. Because the complaint does not describe Skiba engaging in any tortious conduct, we find it does not state any cause of action against Skiba.

### Dismissal of Impact's Civil Conspiracy Claim

Civil conspiracy occurs when "a combination of two or more persons act[ ] in concert to commit an unlawful act, or to commit a lawful act by unlawful means[.]" Banco Popular, 184 N.J. at 177 (quoting Morgan v. Union Cnty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993)). The principal elements of a civil conspiracy are the parties' agreement "to inflict a wrong against or injury upon another, and an overt act that results in damage." Ibid. (quoting Morgan, 268 N.J. Super. at 364). Plaintiffs "are not required to provide direct evidence of the agreement between the conspirators[,]" and may prove the existence of such an agreement through circumstantial evidence. Morgan, 268 N.J. Super. at 365.

37

A conspiracy requires a "plurality of actors, that is, two or more persons, and concerted action." Exxon Corp. v. Wagner, 154 N.J. Super. 538, 545 (App. Div. 1977). However, "[t]here can be no such . . . conspiracy by a corporation . . . with its own officers, agents or employees, who are performing their usual job of formulating and carrying out its managerial policy." Ibid.

The first motion judge dismissed plaintiffs' claim of civil conspiracy with prejudice, finding Broderick, Coluccini, and Ted "were acting within the scope of their employment with [XTech] when they allegedly conspired to misappropriate Impact's proprietary information." Despite the dismissal with prejudice, plaintiffs' amended complaint included a civil conspiracy count, which emphasized that defendants entered into an "unlawful agreement" and "intentionally conspired among themselves to commit the unlawful acts described herein against Plaintiffs for unlawful purposes." The amended complaint clarified, "There were three separate and distinct subgroups to the conspiracy: (1) The XTech, by and through their principals, Ted Monica, Jr., Broderick, and Coluccini; (2) Joe Skiba; and (3) Salgado." The second motion judge dismissed the civil conspiracy count, finding the claim barred due to the previous dismissal with prejudice and because plaintiffs "failed to persuade [the

court] that the actions taken by the [XTech] [d]efendants were not within the scope of their employment."

We are convinced that plaintiffs' amended complaint states a claim for civil conspiracy. The complaint alleges that defendants Broderick, Coluccini, and Ted were engaged in illegal and fraudulent conduct. It cannot be said they were performing their usual jobs with XTech or carrying out managerial policy and operations. Additionally, the complaint alleges Broderick, Coluccini, and Ted conspired with Salgado to commit their fraud against Impact.[8] Salgado is not alleged to be an agent of XTech, but rather a third-party who aided and abetted the XTech defendants. Therefore, even if Broderick, Coluccini, and Ted were acting solely on behalf of XTech, their affiliation with Salgado in this conspiracy satisfies the plurality of actors' requirement.

The complaint describes defendants Broderick, Coluccini, Ted, and Salgado as secretly agreeing and scheming to fraudulently misappropriate Impact's confidential information. By meeting with plaintiffs and feigning interest in restarting Impact, Broderick, Coluccini, and Ted performed an overt

---

[8] The amended complaint also alleges that Skiba, another third-party, conspired with Broderick, Coluccini, Ted, and Salgado; however, we previously determined the claims against Skiba are deficient and were properly dismissed.

A-0879-19

act in furtherance of this conspiracy.  Accepting these allegations as true, plaintiffs set forth a claim for civil conspiracy against the XTech defendants and Salgado.[9]

## Impact's Aiding and Abetting Claim

Liability for aiding and abetting "is found in cases where one party 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.'"  State ex rel. McCormac v. Qwest Commc'ns Int'l, Inc., 387 N.J. Super. 469, 481 (App. Div. 2006) (quoting Judson v. Peoples Bank Tr. & Co., 25 N.J. 17, 29 (1957)).  "[T]he mere common plan, design or even express agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution."  Id. at 483 (citing Restatement (Second) of Torts § 876(b) cmt. d (Am. Law Inst. 1979)).  To prove such a claim,

> a plaintiff must show that "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation."

---

[9]  As previously noted, the Law Division entered an order dismissing plaintiffs' claims against Salgado for lack of prosecution.  Our discussion of plaintiffs' pleadings and the allegations asserted against Salgado does not affect the dismissal of plaintiffs' claims against Salgado.

A-0879-19

[<u>Id.</u> at 484-85 (quoting <u>Tarr v. Ciasulli</u>, 181 N.J. 70, 84 (2004)).]

Furthermore, "A claim for aiding and abetting fraud [thus] requires proof of the underlying tort, that is, the fraud committed by [the principal]." <u>Id.</u> at 484.

Aiding and abetting liability focuses on "whether a defendant knowingly gave substantial assistance to someone engaged in wrongful conduct, not whether the defendant agreed to join the wrongful conduct." <u>Podias v. Mairs</u>, 394 N.J. Super. 338, 353 (App. Div. 2007) (alteration in original) (citations, internal quotations, and emphasis omitted). Determining how much assistance is considered substantial is fact-sensitive. <u>Ibid.</u>

The second motion judge dismissed this count in plaintiffs' amended complaint because he found the allegations of aiding and abetting were conclusory and failed to specify the underlying tort that was aided and abetted. He also noted that "employees cannot be liable for aiding and abetting their employer[,]" and since "the [XTech] [d]efendants are employees of [XTech], their actions cannot be construed as 'aiding and abetting.'"

In our view, the amended complaint states a claim for aiding abetting against defendants Broderick, Coluccini, Ted, and Salgado. The underlying tort claims are those pled elsewhere in the complaint: fraud, unfair competition, and

conversion. The complaint alleges these defendants knew of, supported, and encouraged each other in their scheme to fraudulently misappropriate Impact's confidential information to Impact's detriment. Whether each defendant's participation was substantial, at this point, remains a factual question. At this stage, we accept the amended complaint's allegations that these defendants substantially assisted in the fraud, unfair competition, and conversion against Impact.

Additionally, as we noted regarding plaintiffs' civil conspiracy claim, Broderick, Coluccini, and Ted would not have been acting in their capacity as XTech employees when engaging in fraudulent conduct. And the complaint alleges Salagado, who is not an XTech employee, was working with the XTech defendants to commit the alleged wrongs against Impact. The amended complaint therefore does not merely allege these defendants were aiding and abetting their employer.

### Respondeat Superior

Under the doctrine of respondeat superior, an employer will be held liable to a third party for the torts of an employee if the employee was acting within the scope of his or her employment. Carter v. Reynolds, 175 N.J. 402, 408-09 (2003). "[T]he fact that the tort is negligent or intentional is of no real

42

consequence." Hill v. Fauver, 342 N.J. Super. 273, 305 (2001). An act may fall within the scope of employment although consciously criminal or tortious. Gilborges v. Wallace, 78 N.J. 342, 351 (1978) (holding master liable for conduct not within the scope of employment only if the servant's action advanced "the employer's business or interests, as distinguished from the private affairs of the servant." (quoting Restatement (Second) of Agency, § 238 cmt. b (Am. Law Inst. 1957)));

Conduct by an employee is usually within the scope of employment if the conduct is of the kind the employee was hired to perform, "it occurs substantially within the authorized time and space limits; [and] it is actuated, at least in part, to serve the [employer]." Di Cosala v. Kay, 91 N.J. 159, 169 (1982) (quoting Restatement (Second) of Agency § 228 (Am. Law Inst. 1957)) (first alteration in original). Other factors include:

> whether the conduct is of the same general nature as that authorized, or incidental to the conduct authorized; whether the master has reason to expect that such an act will be done; the similarity in quality of the act done to the act authorized; and the extent of departure from the normal method of accomplishing an authorized result.
>
> [Hill, 342 N.J. Super. at 306 (citing Restatement (Second) of Agency § 229 (Am. Law Inst. 1957)).]

43

Conversely, if an employee deviates from his or her employer's business and commits a tort while in pursuit of his or her own ends, the employer is not liable. Roth v. First Nat'l State Bank of N.J., 169 N.J. Super. 280, 286 (App. Div. 1979).

Plaintiffs' amended complaint alleges facts sufficient to hold XTech liable under a respondeat superior theory for the actions of Broderick, Coluccini, and Ted. Plaintiffs allege these defendants did not fraudulently misappropriate Impact's confidential information merely in pursuit of their own ends, but rather did so to serve XTech and advance XTech's business. Since Broderick, Coluccini, and Ted are the alleged principals of XTech, it follows that their conduct done on behalf of XTech was authorized by XTech. We therefore conclude that Impact asserted a viable respondeat superior claim against XTech. Additionally, we note that because we affirm the dismissal of all claims against Skiba, no claims remain to hold the Giants vicariously liable under a respondeat superior theory. For the same reason, we need not address the rejection of Impact's negligent supervision claim.

In summary, we reverse the dismissal of Impact's claims against the Broderick, Coluccini, Ted, and XTech for common law fraud, common law unfair competition, conversion, quasi-contractual unjust enrichment, civil

conspiracy, and aiding and abetting.   We affirm the dismissal of Impact's remaining claims and all of Mark's claims.

Any arguments not specifically addressed lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed, in part, and reversed and remanded, in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION