**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3638-23

ASTRANZA, INC.,

     Plaintiff-Respondent,

v.

MOD LIFESTYLES, LLC,

     Defendant-Appellant,

and

IVENA PINTO,

     Defendant.

_____

Submitted April 20, 2026 – Decided May 19, 2026

Before Judges Natali and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-7261-16.

Sangwon D. Sohn, attorney for appellant.

Blick Law LLC, attorneys for respondent (Shaun I. Blick and Brett M. Lederer, on the brief).

PER CURIAM

In this breach of contract action, defendant Mod Lifestyles, LLC (Mod) appeals from the court's June 5, 2024 judgment in favor of plaintiff Astranza, Inc., awarding damages in the amount of $785,136.85 following a bench trial.[1] Plaintiff, a broker of home décor items sourced from India, sued defendant sellers for failing to pay hundreds of thousands of dollars for products delivered to defendant for resale.  Defendant primarily contends the court erred in the following ways:  misapplying the Uniform Commercial Code (UCC), N.J.S.A. 12A:2-301, -602, -606, to the parties' transactions; improperly treating alleged consignment agreements as sales contracts; finding liability for breach of contract and conversion; and rejecting defendant's affirmative defenses.  For the reasons that follow, we affirm.

## I.

Plaintiff is a corporation that sources home textile products from vendors in India through its registered agent and owner, Sailesh Lunani.  Defendant is a New Jersey home décor company that designs and sells products such as pillows,

---

[1]  Defendant Ivena Pinto was also sued in her individual capacity, however, following trial, the court dismissed with prejudice all claims against her as an individual.  Accordingly, the term "defendant" refers to Mod, unless otherwise noted.

A-3638-23

cushion covers, placemats, and shower curtains to major retailers in the United States, including Macy's, Bed Bath & Beyond, and TJ Maxx.

Beginning in 2015, the parties entered into several commercial agreements under which plaintiff sourced home textile goods from India and sold them to defendant for resale in the United States. There is no dispute that, between April and October 2015, the parties executed approximately fifteen purchase orders and corresponding invoices for various shipments of goods to defendant. Although the purchase orders themselves lack clarity, we glean that they established "legal agreement[s] between [plaintiff] and [defendant] []" that govern the terms of each transaction.[2]

By late 2015, several disputes arose between the parties as defendant complained of late deliveries and allegedly nonconforming goods. For example, defendant complained that many of the decorative pillow covers lacked the feather or polyester inserts necessary to make the products marketable, and asserted that, to remedy the issue with the unfilled pillows, plaintiff agreed to arrange for another company, Zig-Zag, to provide the missing filler material. However, plaintiff failed to pay to correct the defects, forcing defendant to incur

---

[2]  The purchase orders contain a number of grammatical and font errors which make it difficult to determine the precise terms governing each transaction.

A-3638-23

additional expenses by making direct payments to Zig-Zag to complete the products for retail sale. According to defendant, of the fifteen purchase orders, five were for the "straight" sale of goods, for which they paid $179,116.90 to plaintiff, $123,956.00 to plaintiff's vendors in India, and $180,838 directly to Zig-Zag, amounting to $483,910.90. The remaining ten purchase orders alleged by defendant to be for consignment totaled $719,116.90.

By contrast, plaintiff maintained that defendant sampled and approved the products before shipment, accepted the goods without timely rejection, and thereafter retained, used, and sold them while withholding payment. In its brief, plaintiff further asserted that the fifteen purchase orders and related invoices totaled $956,806.90 and that after agreed upon deductions, defendant still owed $785,136.85.

On February 15, 2016, after defendant raised concerns that plaintiff had not paid the underlying vendors, and at defendant's request, plaintiff issued an "Assurance of Payment to Vendors" letter confirming that payments received from defendant pursuant to the agreed installment schedule in February, March, and April 2016 would be used to satisfy vendor obligations. The letter further provided that, except for Purchase Order No. 100264, which involved goods that

"didn't meet" the parties' quality standards, payment terms were governed by the parties' agreed schedule tied to the anticipated sale of the products.

On March 3, 2016, Lunani emailed Ivena Pinto, Mod's principal, stating, "I haven't heard back from you and it's getting very difficult to answer to [one of the vendors] and the discussion is getting into threat." Three months later, plaintiff asserted that defendant had only paid $199,000 towards the total invoiced amount and still owed $785,136.85.

On June 21, 2016, plaintiff, through counsel, sent defendant a formal demand letter seeking payment of the outstanding balance of $785,136.85 in addition to $27,330.15 for excess filler that was delivered to defendant within ten business days. The letter further asserted that defendant promised to make installment payments but failed to do so and was withholding payment despite having sold the goods.

Plaintiff filed a complaint against defendant and Ivena on October 11, 2016, which was amended approximately two weeks later.[3] The amended complaint alleged the following: breach of contract; breach of the implied covenant of good faith and fair dealing; unjust enrichment; fraud; and tortious

---

[3] Because Ivena and Conrad share the same last name (Pinto), we refer to them by their first name for clarity, intending no disrespect.

A-3638-23

interference with contractual relations. Plaintiff also sought to recover payment of unpaid invoices and attorneys' fees. In its answer, defendant asserted several affirmative defenses and counterclaims, including that the parties modified their agreement and that plaintiff accepted the goods under the relevant provisions of the UCC.

Following years of discovery and various pre-trial motions, the matter was scheduled for a bench trial before Judge Nicholas Ostuni on March 11, 2024.[4] Lunani testified on behalf of plaintiff and defendant presented the testimony of Ivena and Conrad Pinto, her husband, who testified that he was a member of Mod but not otherwise involved in its day-to-day operations. Lunani testified that she brokered the transactions on behalf of her company and the manufacturers and acknowledged that, as problems developed, defendant made certain direct payments to Zig-Zag and certain other vendors in order to make certain products ready for its retail clients, which the court later credited as being $167,604.75.

---

[4] The record shows that prior to trial defendant had moved for summary judgment, arguing plaintiff did not have standing to pursue their action due to the loss of plaintiff's certificate of incorporation, which was revoked in January 2017, which although initially granted, the court reinstated plaintiff's complaint following reinstatement of plaintiff's corporate charter in July 2021.

A-3638-23

Lunani further testified, however, that defendant expressly acknowledged receipt of the goods and agreed to a structured payment plan for the outstanding invoices. Specifically, he explained that during a January 2016 meeting with Pinto, "we did a recap of all the [purchase orders] as per our receiving," which he clarified meant "a confirmation from [defendant] that they did receive the goods." He further testified that Ivena prepared a detailed schedule identifying when the goods would be sold and payments would be made.

According to Lunani, this payment schedule reflected a negotiated agreement under which defendant would remit installment payments tied to the resale of the goods, and that these terms were "based on the payment schedule which was provided by [Ivena]." Lunani also explained that, at Ivena's request, plaintiff issued an "assurance" letter confirming that vendor payments would be satisfied, and stated that "post-this letter I think I've started getting some partial payments from [defendant]," demonstrating that defendant conditioned payment on such assurances while still failing to satisfy the full balance owed. He emphasized that this arrangement reflected efforts by plaintiff to accommodate defendant's demands to secure payment.

Conrad testified primarily about defendant's corporate structure, describing himself as merely "a silent partner" who was "not involved in the

7

business at all," while Ivena alone operated the company. He further testified that defendant remained an operating business and filed tax returns through 2019.

Ivena testified that the parties also had a consignment arrangement under which payment was not required unless and until the goods were sold, and that defendant was entitled to offsets for late deliveries, nonconforming goods, and substantial storage costs allegedly incurred in holding unsold inventory. She also testified that she asked plaintiff to retrieve unsold goods and maintained that defendant's handling of the merchandise was consistent with plaintiff's ownership rights, not adverse to them. She further noted that many shipments arrived late, causing defendant to miss the 2015 Christmas selling season, and that several of the decorative pillows arrived unfilled or were made of "cheap Chinese polyester fabric." According to Ivena, defendant was required to pay approximately $180,838 to Zig-Zag and $123,956 to a separate vendor in India to fill some of the pillows to prepare them for sale, which plaintiff's estimated damages failed to account for.

At the conclusion of the presentation of the evidence, Judge Ostuni issued a written decision entering judgment in plaintiff's favor and dismissing with prejudice all claims against Ivena individually. The court found plaintiff had

A-3638-23

established both breach of contract and conversion. Relying on the purchase orders and corresponding invoices, the court credited plaintiff's testimony that its vendors shipped goods to defendant for which payment remained outstanding. The court determined that, from a total amount of $983,836.90 and after crediting $199,000 in partial payments, defendant owed $785,136.85. The court further credited defendant for paying $167,604.75 directly to vendors on plaintiff's behalf, thus, resulting in a final judgment of $617,532.10 awarded to plaintiff.

As to plaintiff's conversion claim, the court reasoned that defendant exercised control over plaintiff's property by retaining and selling the goods without remitting payment or returning them. However, the court declined to award separate damages on the conversion claim, concluding that "the costs of these goods [have] already been taken into account by this [c]ourt in its damages" pertaining to plaintiff's breach of contract claim. The court rejected plaintiff's remaining counts, finding that the record did not support plaintiff's fraud, breach of the covenant of good faith and fair dealing, or tortious business interference claims. The court also found the claim for unjust enrichment moot in light of its finding defendant had breached the parties' contract.

The court further found unpersuasive defendant's claims that certain goods were "not of the right quality" and had been rejected years after delivery, noting the absence of contemporaneous records, sales documentation, or credible evidence regarding the alleged storage fees or destruction of goods. The court further rejected defendant's contention that it had no obligation to pay for certain goods, which were under consignment, concluding instead that defendant accepted the goods under the UCC by retaining and selling them without effectuating a timely or proper rejection. The court reasoned that the two purchase orders characterized as consignments, resulted in a breach of the agreement by defendant because defendant neither remitted payment for the goods they sold nor rejected and returned the unsold merchandise to plaintiff.[5] The court found defendant's claim that it attempted to have plaintiff retrieve the remaining goods was unsupported by the record and therefore not credible.

In determining damages, the court off-set plaintiff's damages by deducting defendant's direct payments to vendors "on behalf of plaintiff," in the amount of $167,604.75, based on documentary evidence of those payments. However, the court declined to apply any other credits where defendant offered no evidence

[5] Of the ten purchase orders that defendant alleged were consignments, the court specifically referenced two purchase orders (Nos. 100256 & 100258) that it found were in fact goods that were subject to consignment.

additional expenses were incurred and paid. The court similarly rejected defendant's counterclaims for storage fees, late-delivery deductions, or damages related to alleged defective goods on the same basis, citing a lack evidentiary support for those claims.

Finally, the court found no basis to pierce defendant's corporate veil, concluding there was "no evidence" that Ivena or Conrad intermingled personal and corporate assets or used defendant to perpetrate fraud. This appeal followed.

II.

When reviewing a decision in a non-jury trial matter, we "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015) (citing Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). "[W]e do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Seidman v. Clifton Sav. Bank, SLA, 205 N.J. 150, 169 (2011) (second alteration in original) (quoting In re Trust Created by Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J.

276, 284 (2008)). In reviewing the judge's findings, this court "do[es] not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). We, however, owe no deference to the judge's interpretation of the law and the legal consequences that flow from established facts. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Moreover, "[i]nterpretation and construction of a contract is a matter of law for the court subject to de novo review," at the appellate level. Fastenberg v. Prudential Ins. Co., 309 N.J. Super. 415, 420 (App. Div. 1998) (citing Bradford v. Kupper Assocs., 283 N.J. Super. 556, 583 (App. Div. 1995)). We therefore decide such purely legal questions without deferring to a lower court's "interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, 140 N.J. at 378 (citing State v. Brown, 118 N.J. 595, 604 (1990)); see also Zaman v. Felton, 219 N.J. 199, 216 (2014).

When interpreting a contract, the court should consider the plain language of the contract, the circumstances surrounding the contract, and the contract's purpose. Highland Lakes Country Club & Cmty. Ass'n v. Franzino, 186 N.J. 99, 115-16 (2006). "[W]here the terms of a contract are clear and unambiguous

there is no room for interpretation or construction and the courts must enforce those terms as written." Karl's Sales & Serv., Inc. v. Gimbel Bros., 249 N.J. Super. 487, 493 (App. Div. 1991) (citing Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960)). Courts should not "rewrite a contract for the parties better than or different from the one they wrote for themselves." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011) (citing Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001)).

When, however, ambiguous terms exist in a contract, "courts will consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation." Cnty. of Morris v. Fauver, 153 N.J. 80, 103 (1998). "Having found an ambiguity, 'a court may look to extrinsic evidence as an aid to interpretation[.]'" Porreca v. City of Millville, 419 N.J. Super. 212, 232 (App. Div. 2011) (alteration in original) (quoting Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008)).

To establish a claim for breach of contract, a plaintiff must prove (1) they had a valid contract; (2) they did what the contract required them to do; (3) the defendant failed to perform a defined obligation under the contract; and (4) defendant's breach caused a loss to plaintiff. Goldfarb v. Solimine, 245 N.J.

326, 338 (2021). Pursuant to general contract principles, if one party commits a "breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement. . . . [A] breach is material if it 'goes to the essence of the contract.'" Roach v. BM Motoring, LLC, 228 N.J. 163, 174 (2017) (first quoting Nolan v. Lee Ho, 120 N.J. 465, 472 (1990); and then quoting Ross Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 341 (1961)). Whether a breach is material is a question of fact. Chance v. McCann, 405 N.J. Super. 547, 566 (App. Div. 2009).

Before us, defendant principally argues the court erred in finding a breach of contract. Defendant contends that no breach occurred because the parties' agreements were governed, at least in part, by consignment terms under which "no payment [was] required for unsold goods." Additionally, defendant posits that many of the goods sourced by plaintiff arrived late, defective, or incomplete, and were, therefore, unavailable for sale during the critical 2015 holiday season.

Although the parties do not dispute the existence of contractual agreements, the record reflects that those agreements were not models of clarity. Nevertheless, the trial court properly discerned the parties' intent by examining the agreements' language and the surrounding circumstances in accordance with

14

established principles of contract interpretation. <u>Barila v. Bd. of Educ. of Cliffside Park</u>, 241 N.J. 595, 615 (2020).

Guided by these well-established contract principles and considering the deferential standard of review applicable to judgments following bench trials, we reject defendant's challenges and affirm as modified the court's reasoned judgment substantially for the reasons stated in Judge Ostuni's thorough decision. We add the following comments to amplify our analysis and to correct a minor mathematical error in the damages award.

A.

Among the purchase orders at issue, each order expressly states that it "is considered as a legal agreement between the Vendor/Seller and [defendant]," and sets forth the specific goods to be sourced, along with corresponding quantities, pricing, and delivery terms. The purchase orders further required timely confirmation of cost and delivery, providing that "the cost and delivery given on the [purchase order] is considered final and binding." They also imposed a structured system of accountability for delays, including automatic price deductions and additional remedies for extended delays, as well as clarifying vendor responsibility for "all loss of sales chargeback" resulting from failed shipments.

15

Consistent with this express language, as well as the parties' conduct reflected in the record and briefs, we can fairly discern that the parties entered into a commercial enterprise whereby plaintiff sourced goods from vendors in India for sale to defendant, which defendant then sold to various retail stores. This is not disputed. The court concluded as much, noting that "these transactions were recorded through fifteen separate purchase orders and invoices." In reaching its decision, the court examined each of the purchase orders based on Lunani's testimony, which it found to be "highly credible," and determined that defendant owed $785,136.85 based on the documentary evidence presented.

The court further credited Lunani's persuasive testimony that the final purchase price and payment terms for each purchase order and invoice were adjusted over time to account for shifting shipment schedules, product quality, and the involvement of third parties such as Zig-Zag. The court next addressed testimony concerning each purchase order and the parties' efforts to ensure the goods, including the decorative pillows, met appropriate quality standards and were properly filled for retail sale. The court explained that, with respect to at least one purchase order, an adjustment was warranted to account for defendant's receipt of goods that were of inferior quality and therefore had to be sold at a

16

discount. Additionally, the court properly credited defendant for three payments totaling $199,000, as well as payments made directly to vendors to complete goods for resale.

The court, however, rejected as "wholly unsubstantiated" defendant's counterclaim for storage fees. On this point, the court amply noted the lack of evidence showing that any such payments were made by defendant "for the purpose of storing plaintiff's goods," and that the invoices relied upon to establish the payment of storage fees had been counted multiple times.

We are satisfied that the court, having heard the evidence adduced by the parties and observed the witnesses, was in the best position to make its factual determinations based on the "credible evidence in the record." Motorworld, Inc. v. Benkendorf, 228 N.J. 311, 329 (2017) (citing D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013)). The court found Lunani's testimony credible regarding the formation of the parties' agreements, the shipment of goods pursuant to fifteen purchase orders, and defendants' failure to remit payment for those goods, while also rejecting defendant's contrary assertions as unsupported, inconsistent, and lacking in documentary corroboration. Under these circumstances, we are hard pressed to conclude the court erred in finding defendant breached the parties' contractual agreements by failing to remit timely

A-3638-23

payments for goods received, and that such a breach caused substantial identifiable damages to plaintiff.

We are also unpersuaded by defendant's affirmative defenses and counterclaims of late delivery, nonconforming goods, and offsets. As the court noted, defendant failed to support these claims with competent evidence or credible testimony, thus, the court did not err in rejecting them. Moreover, we are satisfied that the court properly credited defendant for payments made directly to certain vendors to complete products for sale in the retail market. We nevertheless conclude that, with respect to defendant's demand for storage costs, the court correctly determined those claims were "wholly unsubstantiated" and unsupported by reliable evidence.

B.

Defendant asserts that the court erred by failing to recognize that certain transactions involved the sale of goods on consignment and misapplied the UCC's "acceptance" principles. Even accepting defendant's contention that certain transactions involved consignment of goods, which was not entirely disputed, the governing principles do not alter the outcome because defendant failed to return the goods or otherwise comply with its obligations under either framework.

18

A consignment is created when a wholesaler "consigns [goods] to a [merchant] on 'memorandum,' to enable the [merchant] to show [the goods] to a prospective purchaser and if . . . bought, to deliver them to such purchaser and to collect the retail price, paying the [consignor its asking price], and retaining the difference between these prices as the [merchant's] own profit." See Charles Bloom & Co. v. Echo Jewelers, 279 N.J. Super. 372, 380 (App. Div. 1995) (quoting Kittay v. Cordasco, 103 N.J.L. 156, 157 (E. & A. 1926)). In the event that the "'prospect' does not purchase, then [the merchant will] return the [goods] to the [consignor.]" Ibid. Any "disposition of [consigned] property," by the merchant, "without authority constitutes a breach of the [consignment] agreement and a conversion." Ibid. (citing Winkler v. Hartford Acc. & Indem. Co., 66 N.J. Super. 22, 27 (App. Div. 1961)); see also N.J.S.A. 12A:9-102(a)(19) to (21) (defining "consignee," "consignment," and "consignor").

In a transaction for the sale of goods, as our Supreme Court has recognized, "the UCC preserves the perfect tender rule to the extent of permitting a buyer to reject [a] good[] for a[] nonconformity." Ramirez v. Autosport, 88 N.J. 277, 290 (1982). To reject goods, the purchaser must notify the seller "within a reasonable time after their delivery." N.J.S.A. 12A:2-602(1). Under N.J.S.A. 12A:2-508(1), "[w]here any tender or delivery by the seller is

rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of [its] intention to cure and may then within the contract time make a conforming delivery."

Once goods are accepted, the buyer "must pay at the contract rate." N.J.S.A. 12A:2-607(1). Moreover, "[a]cceptance of goods by the buyer precludes rejection of the goods accepted." N.J.S.A. 12A:2-607(2). Thus, even where goods are allegedly late, incomplete, or nonconforming, a buyer that retains and uses them without timely rejection is deemed to have accepted them and is limited to whatever remedies remain available for accepted goods. See N.J.S.A. 12A:2-606(1)(c); N.J.S.A. 12A:2-607(2); Ramirez, 88 N.J. at 289-90.

The court rejected defendant's contention that it did not accept the goods, finding instead that defendant "accepted the goods under the UCC" by retaining them without effectuating a proper rejection, and further acknowledging that defendant "sold some of the goods, but could not establish how many . . . to whom, and at what price," while never returning the remainder. In New Jersey, the UCC governs the way in which a buyer must act to effectively exercise its right to accept and reject tendered goods. See N.J.S.A. 12A:2-602, -606. While the court acknowledged that at least two of the purchase orders were structured as consignments, it nevertheless found that defendant "accepted a

bailment/agency relationship with the goods and plaintiff" and that, "[a]ccordingly, if defendant[] wished to 'reject' the goods, as they claim to have, they could have simply returned them to plaintiff, who were the rightful owners pursuant to the consignment arrangement." However, because "both parties testified defendant[] failed to do so," the court properly concluded that defendant's "failure to properly reject the goods[] constituted acceptance of the goods," as a consignee cannot retain goods indefinitely without payment or return. See Charles Bloom, 279 N.J. Super. at 380.

Defendant concedes that at least some of the agreements were traditional purchase orders and thus governed by Article 2 of the UCC. As to those transactions, its retention and resale of the goods without timely rejection constituted acceptance. See N.J.S.A. 12A:2-606(1)(c), -607(2).

C.

We next address defendant's contention the court erred in finding that plaintiff established a claim for conversion.

"Conversion [is] defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" LaPlace v. Briere, 404 N.J. Super. 585, 595 (App. Div. 2009) (quoting Barco Auto

Leasing Corp. v. Holt, 228 N.J. Super. 77, 83 (App. Div. 1988)). Conversion does not require intent or knowledge of wrongfulness by the defendant but only "'the wrongful exercise of dominion and control over property owned by another inconsistent with the owners' rights.'" Ibid. (quoting Sun Coast Merch. Corp. v. Myron Corp., 393 N.J. Super. 55, 84 (App. Div. 2007)).[6]

Here, the court found defendant retained possession of plaintiff's goods, sold at least a few of them, and failed to return or adequately account for those goods that were not sold. The court reasoned that plaintiff satisfied the elements of its conversion claim by establishing that defendant wrongfully exercised dominion and control over property owned by plaintiff in a manner that was inconsistent with the owners' rights. We glean from the record that defendant acknowledged selling certain goods, and, as the court found, "plaintiff eventually made a demand for the property or compensation for the goods in return," and that demand was "wrongfully denied." The court further found defendant was unable to produce reliable record identifying what specific goods remained, were sold or were destroyed. Ivena's testimony confirmed that some goods were sold, and defendant's inability to produce reliable records

_____

[6] See also Charles Bloom, 279 N.J. Super. at 380 (in a consignment "[t]he bailee's disposition of bailed property without authority constitutes a breach of the bailment agreement and a conversion.").

    A-3638-23

identifying what remained, was sold, or was destroyed further demonstrated control over the goods inconsistent with plaintiff's ownership rights.

We also remain unpersuaded that the absence of a formal pre-suit demand defeats the conversion claim, as defendant's conduct—particularly the sale and use of the goods—constitutes an exercise of control inconsistent with plaintiff's ownership rights. The court also properly declined to award separate damages on the conversion claim because the breach-of-contract award fully compensated plaintiff for the value of the goods, rendering any additional recovery duplicative. See Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 562 (2013).

D.

We now turn to briefly address plaintiff's contention the court erred in declining to impose individual liability on Ivena as an officer serving on behalf of Mod.

Piercing the corporate veil is an equitable remedy employed "to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law." State, Dept. of Environmental Protection v. Ventron Corp., 94 N.J. 473, 500 (1983). Courts generally will not pierce the corporate veil, absent extraordinary

circumstances such as fraud or injustice. Ibid. The party seeking to pierce the corporate veil "bears the burden of proving that the court should disregard the corporate entity." Tung v. Briant Park Homes, Inc., 287 N.J. Super. 232, 240 (App. Div. 1996).

Here, the trial court properly found that plaintiff failed to meet that burden. At the outset, the court explained that "[defendant] is a viable corporation which adheres to a legal and legitimate corporate structure," as evidenced by the documents produced by Ivena. With respect to Ivena, the court found there to be a lack of evidence "establish[ing] that [she] and/or [Conrad] intermingled their own funds, property, or assets with [defendant], or that [defendant] was inadequately funded." The court found no evidence that Ivena used defendant Mod "to perpetrate fraud, to accomplish a crime, or otherwise to evade the law." We agree and have nothing further to add.

In sum, we affirm the court's June 5, 2024 judgment following trial, finding defendant liable for breach of contract and conversion, rejecting defendant's defenses and counterclaims, and declining to impose individual liability on Ivena. We, however, part ways with the court's mathematical calculation of damages owed to plaintiff. From our calculation, the court's otherwise sound methodology contains a minor discrepancy of approximately

24                                                                                    A-3638-23

$299.95. We arrive at this variance by subtracting the $199,000 in partial payments from the total invoiced amount of $983,836.90, yielding $784,836.90, rather than $785,136.85 as found by the court. We then apply the $167,604.75 credit for payments made directly to vendors, resulting in damages of $617,232.15, not $617,532.10. Accordingly, we affirm the judgment in favor of plaintiff as modified to include damages of $617,232.15.

To the extent we have not addressed an issue raised by defendant, it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed as modified.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3638-23